## KELLY'S HEIRS ET AL. vs. McGUIRE AND WIFE ET AL.

It is a general rule of construction, that a statute should be so considered as that every clause, sentence, or part, shall stand, if possible; and that general words or clauses, may be restrained by particular words or clauses in the same statute; and when there are different provisions in the same statute, expressed in different words, they ought to be so construed as to avoid inconsistency.

It would be unsafe to construe a statute according to mere grammatical rules, or to rely on punctuation, as any material aid in ascertaining the true meaning. Neither bad grammar nor bad English will vitiate a statute.

The true construction of our statute of Descents and Distributions, (*chapter* 56, *Digest,*) is:

1st. That, as to both real and personal property, it was the design of the Legislature, when there were descendants of the intestate, to send down both to them, *per capita,* if in equal degree, and *per stirpes,* if in unequal degree, without any regard to the fact as to how the estate was acquired.

2d. That, as to personal property, it was the design, where there were no descendants, that it should go to collaterals, in the same way it would have gone to descendants, if there had been any; that is to say, *per capita,* if in equal degree, and *per stirpes,* if in unequal degree, and without inquiry as to how the property was acquired by the intestate.

3d. That, as to real estate, it was the design of the Legislature, where there were no descendants, to point out the lines of the succession, and that this is to depend on the fact whether the inheritance is ancestral or new; and, if ancestral, then whether it come from the paternal or maternal line.

556'     CASES IN THE SUPREME COURT

Kelly's Heirs et al. vs. McGuire and Wife et al.     [JANUARY

4th. If the inheritance was ancestral, and come from the father's side, then it will go to the line on the part of the father, from whence it came, not in postponement, but in exclusion of the mother's line; and so, on the other hand, if it come from the mother's side, then to the line on the part of the mother, from whence it came, to the exclusion of the father's line.

5th. If the inheritance be not ancestral, but a new acquisition, then, after a life estate reserved in succession to the father and mother, if alive, it will go in remainder, first, to the line of the intestate's paternal uncle and aunts, and their descendants, in postponement of the mother's line, until the former becomes extinct; and then to the line of the intestate's maternal uncles and aunts, and their descendants; unless there should be kindred lineal or collateral, who, either in right of propinquity, or by right of representation, stand in a nearer relation to the intestate than the uncles and aunts: in which case, such nearer kindred would take the inheritance to the exclusion of both of these collateral lines; and, in their hands it would become an ancestral estate, and afterwards go in the blood of the relative from whence it came, in the ordinary course of descent prescribed for ancestral inheritances. *Digest, secs.* 10, 11, *p.* 437.

6th. That, when the inheritance is fixed, by these facts, in any given line, it will pursue that line until it becomes extinct, and the objects of bounty, and the order in which they succeed one another, and the proportion they take, are to be ascertained by the first section, which is to be considered as the general table of descent. The father, mother, brothers, sisters, and so on, mentioned in that section, are those who are to be considered when counting from any propositus, whether the propositus of a single line only, or the concurrent propositus of both lines, as the intestate is as to personal property.

7th. In all cases, where the inheritance is in any one line, it there goes in succession *per capita*, if in equal degree, and *per stirpes*, if in unequal degree, precisely as if the other line was extinct, and precisely as the inheritance of a bastard would take a course in his mother's line, he having no father's line at all.

8th. The half-blood and their descendants, take personalty, as well as realty, equally with the whole blood, except that they are excluded from real estate, when ancestral, if they lack the blood of the transmitting ancestor.

Under a prayer for general relief, the court may grant any that the facts stated will warrant, although it may be inconsistent with the special relief prayed. *Cook vs. Bronaugh,* 13 *Ark.* 183.

A party, to be charged in a contract, must not only express his assent that he will be bound, but he must be endowed with such degree of reason and judgment, as to enable him to comprehend the subject; and he must execute it freely and understandingly, with a full knowledge of his rights, and of the consequences of the act.

If a person, although not positively *non compos* or insane, is yet of such great weakness of mind as to be unable to guard himself against imposition, or to resist importunity or undue influence, a contract, made by him under such circumstances, will be set aside.

The opinions of the subscribing witnesses to a deed or contract, are competent in all cases, where the object is to prove capacity or incapacity to make a contract, when the facts or circumstances are disclosed on which the opinion is founded.

Reputation or hearsy, is admissible in all matters of pedigree:. and so, the repeated declarations of the father, that he had married, and by the marriage had two children, naming them; his recognition of them as his legitimate children, their recognition of him as their father, and of each other as brother and sister.; and the fact, that the marriage and legitimacy of the children were spoken of and known in the family, are sufficient to prove the marriage of the father and the legitimacy of the children.

Where property in litigation, is placed in the hands of a receiver, during the pendency of a bill for its recovery, the court should, before the final decree, require the receiver to report his acts and doings under the appointment, and render an account, that the court may ascertain the condition of the property placed in his hands, and be enabled, in its final decree, to settle the rights, and do justice to all the parties in a conclusive manner.

*Appeal from the Circuit Court of Independence County in Chancery.*

Before the Hon. A. B. GREENWOOD, Circuit Judge.

This cause was argued at the January Term, 1854, before the Hon. CHRISTOPHER C. SCOTT, Judge, and Hon. SAMUEL H. HEMPSTEAD, Special Judge.

ENGLISH, for the appellants, James Kelly's heirs. 1. It is submitted, for the heirs of James Kelly, that, upon the death of *Clinton*, the entire estate, personal and real, which descended to him from his father, Charles Kelly, who acquired it, ascended to *Greenberry Kelly*, his grand father, who was the nearest surviving relation to *Charles*, and the nearest, of the whole blood, to *Clinton;* and that the estate did not pass to the *half sisters* of *Clinton;* who were strangers to the *blood* of *Charles*.

It may be well to enquire upon whom the common law cast the real and personal estate of *Clinton Kelly*, upon his death,

that the changes made by our statute of descents and distribution may be more readily understood.

The canons of descent, familiar to every lawyer, follow :

*1st Canon.* The inheritance shall lineally *descend* to the issue of the person who last died actually seized, but shall never lineally ascend. 2 *Black. Com.* 208.

*2d Canon.* The male issue shall be admitted before the female. 2 *Ib.* 212.

3d. Where there are two or more males, in equal degree, the eldest only shall inherit, but the females together. *Ib.* 24.

*4th Canon.* The lineal descendants, *in infinitum*, of any person deceased, shall represent their ancestor; that is, shall stand in the same place as the person himself would have done, had he been living. This is called succession in *stirpes*, according to the roots. *Ib.* 217.

*5th Canon.* On the failure of lineal descendants, or issue of the person last seized, the inheritance shall descend to his collateral relations, being of *the blood of the first purchaser*, subject to the three preceding rules. *Ib.* 220.

*6th Canon.* The collateral heir of the person last seized, must be his next collateral kinsman of the whole blood. *Ib.* 224.

The estate shall escheat to the lord, sooner than the *half-blood* shall have it. *Ib.* 227.

*7th Canon.* In collateral inheritances, the *male* stocks shall be preferred to the *female*— that is, kindred, derived from the blood of the male ancestors, however remote, shall be admitted before those from the blood of the female, however near—unless where the lands have, in fact, descended from a female. *Ib.* 324.

Under the 1st canon of descent, *Greenberry Kelly* could not inherit Clinton's real estate, because the estate could not *ascend*, but must *descend*.

Under the 5th, 6th, and 7th canons, Clinton's half-sisters could not inherit from him; 1st, because they were not of the *blood* of *Charles Kelly*, who acquired the estate, or was the first pur-

chaser; 2d, because they were of *half-blood* to Clinton; and 3d, his male collateral kindred were preferred to them.

*Clinton*, dying without issue, the estate would have descended to the next collateral male kin of the whole blood, under rule *five*, and the three preceding ones. And, as the parties appear upon this record, assuming the legitimacy of Mrs. Eickelburner, *William Martin*, her grandson, and second cousin to *Clinton*, would have taken the estate.

It may be safely asserted that we look alone to our statutes for the disposition of personalty, and not to the common law.

*The 56th chapter* of our *Digest* purports, by its caption, as well as its provisions, to be a statute of *descents* and distribution —that is, to prescribe how both *real* and *personal* estates shall descend, and be distributed, and, in construing its various provisions, they should be made to harmonize with both of these manifest purposes of the act, if possible.

*Section* 1, is in these words : "When any person shall die, having title to any real estate of inheritance, or personal estate, not disposed of, nor otherwise limited by marriage settlement, and shall be intestate as to such estate, it shall descend and be distributed in parcenary, to his kindred, male and female, subject to the payment of his debts, and widow's dower, in the following manner : *first*, to children, or their *descendants*, *in equal parts ;* *second*, if there be no children, then to the father, then to the mother ; if no *mother*, then to brothers and sisters, or their descendants, in equal parts ; *third*, if there be no children, nor their descendants, father, mother, brothers or sisters, nor their descendants, then to the grandfather, grandmother, uncles, and aunts, and their descendants, in equal parts; and so on, in other cases, without end, passing to the nearest lineal ancestor, and their children and their descendants, in equal parts."

This section repeals the 1*st canon* of descents, so far as it prohibits the lineal *ascent* of estates, and enables the father to take the estate of the son dying without issue, *personal* and *real*, and the *grandfather* to take it, where there is no issue, father, mother,

*brothers or sisters, &c.* This section also repeals the 2d *canon* of descents, which prefers the male to the female; also, so much of the 3d *canon* of descents as prefers the *oldest male* to the exclusion of his brothers; and modifies so much of the 7th *canon* as prefers males of the collateral line to females. It does not expressly make any other changes in the canons.

Under this section, the great body of property descends, and is distributed, and it is to be observed and borne in mind, that *personal* and *real property* are put upon the same footing.

The 8th and 9th sections provide for the descent of property per *stirpes*, according to the roots, and accords with the *4th canon*.

The 10th section is in these words: "In cases where the intestate shall die without *descendants*, if the *estate* come *by the father*, then it shall ascend to the father and *his heirs;* if by the mother, the estate, or so much thereof as came by the mother, shall ascend to the mother and her heirs; but if the estate be a new acquisition, it shall ascend to the father for his lifetime, and then descend, in remainder to the collateral kindred of the intestate, in the manner provided in this act; and, in default of a father, then to the mother for her lifetime; then to descend to the collateral heirs as before provided."

Under *section* 10, therefore, *Clinton* dying without issue, his estate went back to *Charles*, who acquired it, and he being dead, it passed to his father, *Greenberry*, who was his nearest of kin, and *heir*, under *section* 1.

*Charles* being dead at the time *Clinton* died, did not prevent the estate from passing through him back to *Greenberry*, his *heir*, because *section* 22, of the statute, declares that "the expression used in this act, 'where the estate shall have come to the intestate, on the part of the father' or 'mother,' as the case may be, shall be construed to include every case where the inheritance shall have come to the intestate by gift, *devise* or *descent*, from the parent referred to, or from any relative of the *blood* of such parent."

The estate in controversy *descended* from *Charles* to *Clinton*, and *Clinton* dying without issue, passed back to *Charles* and his *heirs* — he having had no other child than *Clinton*, his father was his only heir.

But, it is argued that the 10th section applies exclusively to real estate, and not to personal. It is submitted that this construction is not warranted for several reasons : 1st, the first section of the statute clearly manifests the policy of the Legislature to put the descent of personal and real property upon the same footing, and to the same persons. 2d, In this State, where slavery exists, the value of personal estates greatly preponderates over that of real, and every reason that may have induced the Legislature to provide for the restoration of real property to the first purchaser, or his blood, on the failure of issue of the person last seized, applies, with increased force, to personal property, including slaves. 3d, The first section, putting the descent of personal and real property, generally, on the same footing, and to the same persons, if the Legislature intended to vary the rule in the 10th section, the intention, it is reasonable to suppose, would have been expressed, and not left to implication or construction.

The word *"estate"* is used in the 10th section as a generic term, embracing every species of property, and not in a restricted technical sense, applying only to lands. It is often used in the same book, where it manifestly embraces real and personal property, and sometimes personal property only.

Nor do the words *"ascend"* and *"descend,"* as used in the 10th section, indicate that the section applies only to lands. These words are used in their ordinary, and not in a restricted, sense. The word *descent*, is often applied, in the law books, to the transmission of personal as well as real estate, (2 *Kent Com.* 426,) and simply means the passing or transmission of property from an ancestor to an heir — the word *ascent*, the passing of property from an heir or descendant to an ancestor.

*Section* 12, is in these words : "Relations of the half-blood
71BB

562      CASES IN THE SUPREME COURT

Kelly's Heirs et al vs. McGuire and Wife et al.      [JANUARY

shall inherit equally with those of the whole - blood in the same degree; and the descendants of such relatives shall inherit in the same manner as the descendants of the whole blood, unless the inheritance come to the intestate by descent, devise or gift of some one of his ancestors, in which case all those who are not of the blood of such ancestor shall be excluded from such inheritance."

It is argued, by the counsel of the half-blood, that the qualification or third clause of this section merely cuts off "*descendants*" of the half-blood from ancestral estates, and not "*relations*" or parents—that it does not exclude *Clinton's* sisters, but would have cut off their descendants, had the sisters been dead, leaving children.

Such a construction puts the first clause of the 12th section in direct conflict with the 10th section, which preserves estates in the hands of the *blood of those* who *acquired* them; and clearly indicates that it was the policy of our Legislature to remove the disqualification resting upon the half - blood by the common law only as to estates *acquired* by the intestate, and not to remove such disqualification as to estates transmitted to them from *ancestors*.

An argument has been based upon the punctuation of the 12th section, to support the construction that the 3d clause qualifies the second clause only, and not the first; and also upon the grammatical construction; but these can have no weight, because the proper construction of the whole section is to be derived from the general scope, tenor, and context of the language employed.

Again, it is argued, by opposing counsel, that, if the 3d clause of the 12th section does qualify the 1st and 2d clauses, and exclude from ancestral estates every degree of half - blood, it only cuts them off from the real estate of the intestate, as the term "*inheritance*" is used, which is defined by the 20th section to mean *real estate*.

Assume that the words *inherit* and *inheritance* refer exclusively to *real estate* wherever used in the chapter, and the hypothesis

will lead to absurd consequences, and mar the harmony of the chapter as a system of descents and distributions, and will readily be seen by a comparison of the 2d, 3d, 8th and 9th sections.

All the provisions of the chapter under consideration, will better harmonize upon the hypothesis that the descent and distribution of real and personal estate, generally, is put upon the same footing, that both go to the same persons and in the same proportions, with the qualification that *ancestral* estates, personal and real, are to be preserved in the hands of the *blood relations* of those who acquired them, than upon any other hypothesis. If this be so, the 20th section, defining the term *inheritance*, must yield to the general scope and design of the whole chapter. *Bacon* says "a thing which is within the letter of a statute, is not within the statute, unless it be within the intention of the makers. And, again, the construction to be put upon a statute, is that which best answers the intention of the Legislature, and whenever this intention can be discovered, it ought to be followed, although such *construction seems contrary to the letter of the statute.*" *Bacon Ab.*, STATUTE I, 5.     *Miller vs. Salmons, 7 Welsby, Hurlston & Gordon, Exchquer Reports,* per MARTIN, J., p. 522. PARKE, J., p. 545.

We have seen that to take the words *estate, descent, inherit* and *inheritance,* to apply to real estate exclusively, wherever they occur in the chapter, leads to absurd results, and mars the harmony of the chapter, but to take them in a more liberal and popular sense, as they are often used in the books, as well as in common parlance, the provisions of the chapter harmonize.

We have seen that the word *estate,* is often used in the *Digest,* in reference to personal property, and often to include a man's entire property, personal and real. We have also given an instance above, where Mr. KENT speaks of the *descent* of personal property. Other instances occur in *4th Kent,* 420, *et seq.*

So he applies the term *inherit* to personal estate. He says, in a number of the States, "bastards can *inherit* from, and transmit

to, their mothers, real and *personal estates.*" 4 *Kent* 414. In the succeeding pages, the word is frequently applied in the same way. So in 2 *Kent* 212, *et seq.* The term *inherit,* as well as *inheritance,* is used in regard to personal property.

So the word *distribution* is sometimes applied to the partition, or division of *real estate* among heirs, though usually applied to personal property. It is so applied (to lands) by JACKSON, J., in *Sheffield vs. Lovering,* 12 *Mass.* 493-4. It is used in reference to both personal and real estate, in the section above quoted from *S. & Mc. Digest.*

It was not the design of our Legislature to proscribe *half - blood,* merely because they were such, but the policy (in this, as in other States, 2 *Hillard on Real Property, p.* 198, *to* 207,) was to preserve in the hands of a man's own blood relations, property acquired by him, and not to permit it to pass into the hands of strangers; and there is certainly nothing unjust or unreasonable in this.

The general policy of the country excludes any construction of our statute that would give the half-blood the personal and not the real estates, because, in a majority of the States, as Mr. KENT remarks, (2 *Kent,* 426,) "the descent of real and personal property is to the same persons, and in the same proportions;" and, as before remarked, there is the same reason, in this State, for preserving ancestral slaves, and other personal property, in the hands of the blood of him by whose industry they were acquired, as lands.

2. It is affirmatively alleged, by the cross-bill of the Eickleburner heirs, that, at the time *Greenberry Kelly* conveyed the estate in controversy, to his nephew, *James Kelly,* he was, by reason of old age, disease and intemperance, totally destitute of capacity to execute a valid deed; that it was obtained from him by fraud and circumvention, and is null and void. These allegations are positively denied by the sworn answer of James Kelly; and it is submitted that the complainants, in the cross-bill, have utterly failed to sustain them by the proof in the cause.

*Fraud* and *incapacity* being alleged by complainants in the cross-bill, and denied by the oath of James Kelly, the complainants were bound to establish the affirmative by the oath of two witnesses, or one with corroborating evidence; and there being, in this case, a large number of witnesses on both sides, this *preponderance* in favor of the *affirmative* must *prevail* throughout the *whole* of the *evidence*, or must still result from the entire testimony, otherwise the truth of the answer — *the denial* — will *prevail*.

In addition to this advantage, on the part of *James Kelly*, there is a great legal principle that comes to his aid, and that is, that every man is presumed to be *sane* and *rational*, and the party impeaching his sanity, or alleging insanity, must prove it. See *Dean's Med. Juris.* 525; *Jackson on dem., &c. vs. King et al.*, 8 *Cowen Rep.* 207. This legal presumption is recognized in all the cases cited below.

To render the deed in question void for want of capacity, it was incumbent on the parties impeaching it, to show that, at the time it was executed, Greenberry Kelly was *totally destitute of understanding.* 1 *Beck Med. Juris.* 380; *Van Alst vs. Hunter*, 5 *J. C. R.* 148; *Dean Med. Juris.* 555 to 568; *Jackson on dem. &c. vs. King et al.*, 4 *Cowen*, 207; *Odell vs. Buck*, 21 *Wend.* 142; *Beverly's Case*, 4 *Coke* 123; *Co. Litt.* 247 *a; Stewart's Exr. vs. Lispenard*, 26 *Wend. Rep.* 255; *Blanchard vs. Nestle*, 3 *Denio* 37; *Case of McDaniel's Will*, 2 *J. J. Marsh.* 331.

The opinions of witnesses, aside from the facts stated by them, are of no value in estimating capacity. It is for the court, and not the witnesses, to form an opinion from the facts. *Sears vs. Shafer*, 1 *Barbour Sup. Court Rep.* 412; 3 *Wash. C. C. R.* 587. See the collection of authorities on this subject, in *Cowen & Hill's Notes on Phillips' Ev.*, note 529, vol. 2, part 1, *p.* 759.

GREENLEAF, says, (*Evidence, vol.* 1 *sec.* 440,) that subscribing witnesses to a will may give opinions as to the testator's sanity, but other witnesses can speak only as to facts; but DANIEL, J., in *Crowell vs. Kirk*, 3 *Dev.* 357, said that even subscribing witnes-

ses were not allowed to express an opinion as to the testator's sanity.

WATKINS and CURRAN & GALLAGHER, for appellants, the heirs of Eikelburner. On behalf of the *Eikelburners*, it is submitted:

1. That the estate of *Clinton* Kelly, not being a new acquisition, but having come to him by his father *Charles* Kelly, under 1st and 10th sections of the statute of *Descents and Distributions, Digest, chap.* 56, upon his death ascended to his *paternal* grandfather, *Greenberry* Kelly. We are content, for the present to insist, that such is not only the letter, but the spirit and reason of the statute, being in accordance with the dictates of nature, in all countries; and we confess that, at first sight, we are unable to perceive what available arguments can be made use of to rebut the conclusions we have drawn in the premises.

With regard to the incapacity of old Greenberry Kelly to execute a valid conveyance, we would refer the court to the following authorities:

The same amount of capacity to make a will, is not required, that the law requires to make a valid contract. *Lespenard Will,* 26 *Wend.* 306; *Ib.* 311, *and cases cited; Bell vs. Martin,* 1 *Dow. Parl. R.* 386; 3 *Wash. Ct. Ct. Rep.* 587; 4 *Wash. Ct. Ct. Rep.* 262; 9 *Vesey,* 610; *Wilson vs. Wilson,* 2 *Dow. Parl. R.* 383; *Harrisson's Will,* 1 *B. Monroe* 351; *Dean Med. Juris.* 565; 2 *Green. Ev., p.* 648, *sec.* 688, *note* 3, *and cases cited;* 1 *U. S. Law Mag.* 224, *Converse vs. Converse.*

It may safely be assumed, as a general rule, that wherever a person, through age, decrepitude, or affliction, or disease, becomes imbecile, and incapable of managing his own affairs, and a proper subject of a commission in the nature of a writ of lunacy, so as to have a *curator* or *tutor* appointed for him, in such case, a court of *chancery* will set aside any unreasonable or improvident disposition made by him of his property. Chancellor KENT, in the *matter of Barker,* 2 *Johnson Chancery Rep.* 234, says: "Yet it is certain, that when a person becomes mentally disabled,

from whatever cause the disability may arise, whether from sickness, vice, casualty or old age, he is equally a fit and necessary object of guardianship and protection."

Where the question is, whether a grantor had sufficient legal capacity to execute a deed, there it is incumbent on the party assailing the deed, to show unsoundness of mind, or insanity. But it is incumbent on a party, who sets up a voluntary conveyance, executed under suspicious circumstances, *to show affirmatively that the transaction was fair and honest.* The whole burthen of proof is shifted, and rests on the party claiming under the deed. When the gift is disproportionate to the means of the giver, and the giver is a person of weak mind, of an easy temper and yielding disposition, liable to be imposed upon, a court of equity will look upon such a gift with a very jealous eye, and will very strictly examine the conduct and behavior of the person in whose favor it is made. If it can discover that any arts or stratagems, or any undue means have been used by him to procure such gift; if it see the least speck of imposition at the bottom, or that the donor is in such a situation with respect to the donee as may naturally give him an undue influence over him; if there be the least *scintilla* of fraud, a court of equity will interpose. *Sears vs. Shafer,* 1 *Barbour's Sup. Court Rep.* 413; *Wheelan vs. Wheelan,* 3 *Cowen* 586; *Clarke vs. Fisher,* 1 *Paige* 171.

No man can look at the *facts* of this case without having his sense of propriety and justice shocked. In the language of Lord HARDWICK, in *Chesterfield vs. Jansen,* 2 *Vesey. Sen.* 155, the fraud "May be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses, and not under delusion, would make, on the one hand, and as no honest or fair man would accept, on the other." *Van Alst vs. Hunter,* 5 *John. Ch.* 160; *Gartside vs. Isherwood,* 1 *Brown Ch. Rep.* 560; *Gilson vs. Joyes,* 6 *Vesey* 278; *Somers vs. Skinner,* 16 *Mass.* 348; *Dunn vs. Chambers,* 4 *Barbour Sup. Court Rep.* 379; *Russell vs. Russell,* 4 *Dana* 43, 44; *Cruise vs. Christopher's Administrators,* 5

*Dana* 182; *Harvey vs. Pecks*, 1 *Munford* 526; *Whitehorn vs. Hines*, 1 *Munford* 587; *Brice vs. Brice*, 5 *Barbour Sup. Ct. Rep.* 540; *Osmond vs. Fitzroy*, 3 *P. Williams* 130, *and cases cited in notes; Administrator of Bunch vs. Administrator of Hurst*, 3 *Dessa.* 292.

Connected inseparably with this question, is that feature in the case, which stamps the conveyance with fraud and unfairness. James Kelly first procured *a power of attorney* from Greenberry Kelly, to recover the estate *for him*: While that power was unrevoked, the *agent* procured from his *principal*, a gift or conveyance of the whole estate, *to himself*, without any valuable consideration. This instrument moreover is curiously worded. Taken in connection with the fact of the previous power of attorneys, if old Greenberry Kelly had any glimmering of understanding or judgment, it was calculated to impose upon him, and convey the idea that this paper was of a like character.

The rule of Equity applicable to dealings between agent and principal, is clearly laid down in 1 *Story Eq.*, *p.* 318, *sec.* 315, *et seq; Ib. p.* 232, *sec.* 218. It seems to us, that this feature in the case, taken in connection with the gross imbecility of Greenberry Kelly, is *conclusive.*

Some rule of law must of necessity be laid down, as a test of legal capacity, and as it is impossible, or at least difficult, to undertake to discriminate between different degrees of understanding, between persons of sound minds and those of weak minds; the abstract rule of law is that neither eccentricity nor imbecility of mind, nor extreme old age, nor (as it regards wills) incapacity to make contracts, are sufficient to invalidate a will, and that the words *non compos* or of unsound mind, are legal terms, and import *a total deprivation of understanding.* Applying this rule to deeds or contracts, and we have stated it in the broadest and most favorable manner for the conveyance, and comparing the *facts* reported in the leading cases relied on by the counsel for James Kelly, with those proved in this case, we think it will clearly appear that the capacity to contract, was wanting. See

*Hale vs. Brown*, 11 *Ala.* 87; *Donelson vs. Posey*, 13 *Ala.* 752; *Lazan vs. Toulmin*, 9 *Ala.* 662; *Willson vs. Bigger*, 7 *Watts & Serg.* 111; *Rumph vs. Abercrombie*, 12 *Ala.* 64; *Ford vs. Ford*, 7 *Humph.* 92; *Howard vs. Coke*, 7 *Ben. Mon.* 655; *Clarke vs. Lawyer*, 3 *Sandf. Ch.* 351; *Butler vs. Haskell*, 4 *Dessa.* 684.

The 1st section of the 56th chapter of the *Revised Statutes*, is as follows: "When any person shall die, having title to any real estate of inheritance, or personal estate, and shall be intestate to such, it shall *descend* and be *distributed* in *parcenary* to his *kindred, male and female*, subject to the payment of debts," &c. Now mark the words, the estate, both real and personal, shall *descend* and be *distributed* to his kindred, male and female. Does not this section "*ex vi termini*," show that the position we assume in our 4th point, is undoubtedly and incontrovertibly correct? *Clark vs. Sprague*, 5 *Black. Rep.* 415.

The section above referred to, arranges the "table" of descents and distributions as follows: First, to children or their descendants in equal parts; second, if there be no children, then to the father, then to the mother, if no mother, then to the *brothers* and *sisters*, or their descendants in equal parts; third, if there be no children or their descendants, father, mother, brothers or sisters, nor their descendants, then to the grandfather, grandmother, uncles and aunts and their descendants, in equal parts; and so on, in other cases without end, passing to the nearest lineal ancestor, and their children and their descendants in equal parts." Now, admitting that the remaining portion of our statute contained no restricting clause concerning the half-blood, that under this section alone, the terms "*brothers* and *sisters*," included the half-blood as well as the whole-blood; but brothers and sisters alone; not their descendants or any other relatives of the half-blood, as would be the case in the whole-blood; yet all the authorities cited by the opposite party [i e. the half-blood] from the Kentucky, Mississippi, Indiana and Massachusetts Reports, are based upon statutes which contain no restrictions upon the half-blood, and are merely to the effect that, where the statute

72BB

570 CASES IN THE SUPREME COURT

Kelly's Heirs et al. vs. McGuire and wife et al. [JANUARY

contains no words restricting the rights of the half-blood, and the words *brothers* and *sisters*, are used *generally*, that, in such case, the half-blood are included as well as the whole-blood, under such *generic* terms.

But the 10th section is as follows:

"In cases where the intestate shall die without descendants, if the *estate* come by the father, then it shall ascend to the father and his heirs; if by the mother, the *estate*, or so much thereof as came by the mother, shall ascend to the mother and her heirs; but if the *estate* be a *new acquisition*, it shall ascend to the father for his lifetime, and then descend in remainder to the collateral in kindred of the intestate, in the manner provided in this act; and default of a father, then to the mother for her lifetime, then to descend to the collateral heirs, as *before* provided;" and the expression used in this act "where the estate came by the father or mother," is explained by the 22d section of said act, which declares "that such expression, as the case may be, shall be construed to include every case where the inheritance shall have come to the intestate by gift, devise, or descent from the parent referred to, or from any relative of the blood of such parent." And by the 12th section, it is enacted that, "Relations of the half-blood shall inherit equally with those of the whole-blood."

But, if the proposition be true, the deduction is untenable, inasmuch as in the cross-bill filed by the said Eikelburners, they fully trace their relationship and genealogy as well with Charles Kelly and D. W. Clinton Kelly, as with old Greenberry Kelly, and having stated such *facts*, it is the province of the court alone to draw the proper *deductions* therefrom; if the pleader undertakes to state the legal *conclusion*, it is at the most mere surplusage, and even when alleged it is improper to make it the subject of traverse. It is the duty of the pleader to state the facts. It is the province of the court alone to draw the legal *conclusions* therefrom. Upon this point, we do not think it necessary to call the attention of the court to any but the following authorities. "It is unnecessary to state matter of law, for this the judges are

bound to know, and can apply for themselves to the facts alleged." *Stephen on Pleading*, *page* 345, *rule* 2, (*Doct. Pl.* 102, per BUTLER, J., *The King vs. Lyme, Regis. Doug.* 159;) *ib.* 348. As regards the analogy of the rules of pleading in equity, to those at common law, see *Lube's Equity Pleading*, *p.* 2, 3, 9, *and note.*

We maintain, in behalf of the Eikelburner heirs, that they are entitled to the whole of the estate, real, personal and mixed, to the exclusion of the half-blood, who are not of the blood of Charles Kelly.

It cannot be denied that our statute is a complete system of descents and distributions, as *ex vi termini*, it purported to be, and must be construed according to the spirit of the act, more than even by the letter thereof. 8 *Term* 254; 3 *Call* 303; 2 *Wash.* 296; 4 *Bac. Abr.* 638.

We maintain that our statute of Descents and Distributions, has four grand objects: 1st, To destroy primogeniture; 2d, To destroy the indivisibility of real estate; 3d, To preserve the *estate* (both real and personal) in the blood of the transmitting ancestor; and 4th, To cause the estates (both real and personal) of persons dying intestate. to go together. *Jackson vs. Cooley*, 8 *J. R.* 128 *and* 135; 1 *Phil. Ev.* 240.

For proof of marriage, we refer to 1 *Green. Ev.*, *sec.* 107; 4 *Phil. Ev.*, *p.* 286, *et seq.; Fenton vs. Reed.* 4 *J. R.* 52.

Finally, as regards declarations of members of family to prove marriage and relationship, we would refer the court to the following authorities, viz: 1 *Phillips & Ames on Ev.* pages 243–7; *Henney vs. Henney*, 2 *W. Blk.* 877; *Read vs. Passer*, 1 *Esp.* 213; *Leader vs. Berry, do.* 350; *Doe vs. Fleming.* 4 *Binn* 266; *Smith vs. Smith*, 1 *Phil.* 294; *Hammack vs. Bronson*, 5 *Day* 290; *Moulkon vs. Attorney General*, 2d *Russ & Mylne* 164; *Bowles vs. Young*, 13 *Ves.* 140–147; *Whitecock vs. Baker*, 1 *Ves.* 514; *Goodnought vs. Moss, Cowper* 591; *Johnson vs. Lawson*, 2d *Bing.* 86; *Chapman vs. Chapman*, 2 *Conn.* 47; *Berkley Peerage case*, 4 *Camp.* 401–418; *Doe vs. Brady*, 8 *B. & C.* 813; *Jackson vs. Russell*, 4 *Wend.* 545; *Keller vs. Nuttz*, 5 *S. & R.* 251; *Whitehead*

572          CASES IN THE SUPREME COURT

Kelly's Heirs et al. vs. McGuire and Wife et al.          [JANUARY

*vs. Clanch*, 2d *Hamond* 3 *and* 4; *Fenton vs. Russ*, 4 *Johnson R.* 52, 54; *Johnson vs. Johnson*, 1 *Dessau.* 595; *Allan vs. Hall*, 2d *Nott & McCord* 114, *et seq.*

3d. It is insisted that the Eikelburner heirs cannot recover, if the half-blood could not inherit, as the grandfather would only take an equal part with Mrs. Eikelburner's descendants, and that is not the case made in the bill.

We deny that the paternal aunt would inherit the estate with the grandfather, and allege that such a proposition is contrary to the letter and spirit of our Revised Statutes. *Sec.* 1, *Rev. Stat.*, *chap.* 56, entitled Descents and Distributions, says: "Estates of deceased persons dying intestate shall descend and be distributed, &c., 1st to children or their descendants in equal parts; if no children, then to the father, then to the mother; if no mother, then to the brothers and sisters, or their descendants in equal parts; third, if there be no father, mother, brothers or sisters, nor their descendants, then to the grandfather, grandmother, uncles and aunts, and their descendants in equal parts; and so on, in other cases without end, passing to the nearest lineal ancestor and their descendants in equal parts." And, again, *section* 10, of the same statute, is as follows: "In cases where the intestate shall die without descendants, if the estate come by the father, then it shall ascend to the father and his heirs, &c. Now, in the present case, the estate came to D. W. C. Kelly, on the part of his father, Charles Kelly, and upon his death without descendants, who, by the aforesaid section, were his heirs? Why, his father being dead, it went to the heirs of Charles Kelly, and by the first section above cited, old Greenberry Kelly [the nearest lineal ancestor] was Charles Kelly's heir, and upon Greenberry Kelly's death, the Eikelburners took the estate by virtue of their being descended from old Greenberry Kelly, and from the fact that they were the nearest collateral relations of the whole-blood of the said Charles Kelly.

As to the opinions of witnesses, on questions of soundness or unsoundness of mind, we submit the current and general result

of the authorities to be as follows. The opinions of medical men, are always admissible. The attending physicians, are presumed to have peculiar opportunities for judging of capacity, and their opinions, based on their observation and scientific knowledge, are entitled to the first consideration. And such opinions are admissible in evidence, though the witness founds them not on his own personal observation, but on the case itself as proved by other witnesses on the trial—not the general merits of the cause, but on the facts proved, though he may not be asked his opinion of the case on trial, he may be asked his opinion upon a similar case hypothetically stated. 1 *Green. Ev.*, sec. 440; *Culver vs. Haslam,* 7 *Barbour Sup. Court Rep.* 322. The testimony of Dr. *Kirkwood,* is clearly admissible. He was not asked as to the validity of this particular conveyance, or the capacity of Greenberry Kelly to execute it, but, in view of the facts testified to by other witnesses, supposing them to be true, what was likely to be the effect of the disease, old age, &c., upon the mind, and the capacity to dispose of property.

Next, subscribing witnesses may testify as to their opinions, because the law (more especially in regard to wills) has placed them about the testator to ascertain and judge of his capacity. 1 *Green. Ev.*, sec. 440; 2 *ib.*, sec. 691. Questions of this nature are found generally to turn upon the opinions of the subscribing witnesses, because their observation relates to the precise time of executing the deed or will.

Questions as to soundness or unsoundness of mind, *form an unavoidable exception* to the general rule, that only *experts* can testify as to opinions. *Culver vs. Haslan,* 7 *Barbour Sup. Court Rep.* 321, and *Clary vs. Clary,* 2 *Iredell* 78, quoted in *Potts vs. House,* 6 *Geo.* 324, (*U. S. Law Mag.,* vol. 3, *p.* 278,) are leading cases on this point. In *Culver vs. Haslan,* WILLARD, J., cites numerous cases, from which the rule is well established, that opinions of all witnesses are admissible, when founded on their actual observation and acquaintance with the testator. The value and force of the opinion depend on the general intelligence of the

574 CASES IN THE SUPREME COURT

Kelly's Heirs et al. vs. McGuire and Wife et al. [JANUARY

witness, the grounds on which it is based, the opportunities he has had for accurate and full observation, and his entire freedom from interest and bias." . *Whitehorn vs. Hines*, 1 *Munford* 564.

2d. As to the pedigree, or relationship of the Eikelburners to Charles Kelly, the propositus, in this case, and their legitimacy.

The recognition or proof of collateral relationship, is admissible evidence of the lawful marriage of those through whom that relationship is derived. 2 *Green. Ev.*, sec. 462.

As to proof of declarations and hearsy, to prove "pedigree," we refer to 1 *Green. Ev.*, sec. 103; *Elliott vs. Parsall*, 1 *Peters* 337; 2 *Phil. Ev.*, p. 617, *note* 466; *ib.*, p. 618, 19 *and* 20, in the same degree; and the descendants of such relatives shall inherit in the same manner as the descendants of the whole blood, *unless* the inheritance came to the intestate by descent, devise or gift of some one of his ancestors, in which case, *all those* who are not of the blood of such ancestor, shall be excluded from such inheritance." Comparing these several sections together, it is apparent that it was the intention of the Legislature to exclude all persons, not of the blood of the ancestor from whom the estate, both real and personal, descended, from a share in the inheritance.

H. F. FAIRCHILD, for appellees, Mrs. Marsh and Mrs. McGuire. I. The property of Clinton Kelly, at his death, fell to his sisters, Mrs. Marsh and Mrs. McGuire. They have it by our statute of Descents and Distributions: "Sec. 1. When any person shall die, having title to any real estate or inheritance, or personal estate, not disposed of, nor otherwise limited by marriage settlement, and shall be intestate as to such estate, it shall descend and be distributed, in parcenary, to his kindred, male and female, subject to the payment of his debts, and the widow's dower, in the following manner: 1st, to children or their descendants, in equal parts; second, if there be no children, then to the father, then to the mother; if no mother, then to the brothers and sisters, or their descendants, in equal parts; third, if there be no children, nor their descendants, father, mother, brothers or sis-

ters, nor their descendants, then to the grandfather, grandmother, uncles and aunts, and their descendants, in equal parts; and so on, in other cases, without end, passing to the nearest lineal ancestor, and their children and their descendants, in equal parts." For they, Mrs. Marsh and Mrs. McGuire, are the sisters of Clinton Kelly, and, under the 1st section above copied, take his goods and estate. *Sheffield vs. Leveriny*, 12 *Mass.* 496; *Clay vs. Cousins*, 1 *T. B. Mon.* 75; *Garner vs. Collins*, 3 *Mass.* 403, 404; *Doe & Hicky vs. Deloach*, 1 *How. Miss.* 37; *Clark vs. Sprague*, 4 *Blackf.* 412; *Grigsby vs. Breckenridge*, 12 *Ben. Mon.* 631; *Wren and wife vs. Carnes and wife*, 4 *Dessa.* 408, 409, 410, 419, 420.

Sec. 12, of same chapter, is as follows: "Relations of the half-blood shall inherit equally with those of the whole-blood in the same degree; and the descendants of such relatives shall inherit in the same manner as the descendants of the whole-blood, unless the inheritance come to the intestate by descent, devise, or gift, or some one of his ancestors, in which case, all those who are not of the blood of such ancestor, shall be excluded from such inheritance." This section does not conflict with the point. It excludes the descendants of Mrs. Marsh and Mrs. McGuire from any inheritance that came to Clinton Kelly; it does not affect them. Such is the grammatical, the logical, and the legal, construction of this section, and the only one conformable to the spirit of the statute.

1. The grammatical and logical construction of the section.

2. The legal constructions of the section, is as above given. On the construction of the sentences and clauses in the section, we cite a few authorities. *Sabron vs. Woram*, 1 *Hill* 92; *Areson vs. Areson*, 5 *Hill* 410; *S. C.*, 3 *Denio* 465, 469, 470; *Van Allen vs. Mooers*, 5 *Barb.* 111; *Sholl vs. Sholl*, do. 312; *Leggett vs. Perkins*, 2 *Comst.* 315; *Curle vs. Curles Admin.* 9 *Ben. Mon.* 310.

3. In ascertaining the spirit of the statute, we must remember that it enlarges the rights of the half-blood, and we ought, therefore, not to draw arguments and illustrations to expound the statute, from the spirit, doctrine and analogies of the common law,

576        CASES IN THE SUPREME COURT

Kelly's Heirs et al. vs. McGuire and Wife et al.        [JANUARY

but from the statute of distributions, and from the statutes of the States; that although diverse in some particulars, concur in holding the half-blood worthy to inherit in greater or less degrees. 4 *Kent* 374; *Clay vs. Cousins*, 1 *T. B. Mon.* 75; *Nichol vs. Dupree*, 7 *Yerg.* 426, 427.

Our statute is a complete scheme of descents, and must be construed by its intent, gathered from the words, having due reference to the derivation, reason and spirit of the enactment. Rules of descent are creatures of positive law, but everywhere recognize the claims of relationship. *Gardner vs. Collins*, 2 *Pet.* 93; 2 *Black.* 211; *Wendell's Ed.* note 617; 4 *Kent* (*7th Ed.*) 376, 411 *marg. pages.*

For the rule of the common law object of the rule relative to the half-blood, see 4 *Kent* 402, (*7th Ed.*) *marg.;* 2 *Blacks.* 224, 227, 230, 231. Condemned in 2 *Blackst.* 231, 233, and repealed in England, *Id.* 240; 4 *Kent* 403, and never was applied to the commonest and highest inheritances, as estates entailed and the sovereign power. Whence comes the conclusion, that, so far as the statute enlarges the rights and capacities of the half-blood, the constructions must be liberal, in harmony with the spirit of the statute, and prevailing tendency of legislation and construction upon the subject, and so far as the statute respects the rights, and confines the capacities of the half-blood, its meaning must be confined within the words used.

4. The restriction upon the descendants of the half-blood, in section 12, accords with authority and legal analogies. *Stretch vs. Stretch*, 1 *South.* 182, 185; 4 *Dessa.* 413. As in the early Kentucky and Virginia statutes, and those of other States, that allow the half-blood to have inheritable capacity, but assign it a place after the whole-blood of the same degree. It corresponds with the 4th canon of English descents. 2 *Black's* 216, 219; 4 *Kent* 384, 375, 389, 391, 400, 408. And with the rule that controls the succession to personal property, wherever the common law prevails, viz: that stated in the statute of distributions, that there shall be no representatives among collateral relations, after

the children of brothers and sisters. *Marr vs. Harding*, 2 *Vern.* 233; *Petty's case*, 1 *P. Wms.* 25; *Bowers vs. Littlemood*, do. 594; 4 *Dessa.* 410, 411, *in notes.*

We have nothing to do with sections 10 and 11, as they have no application till the intestate, Clinton Kelly, who had no father or mother, be shown to have died without sisters.

II. Throwing aside the claims of the half-blood, Greenberry Kelly was not the heir of Clinton Kelly. The bill and cross-bill affirm the fact. The half-blood deny it. The marriage of Greenberry Kelly to the mother of Charles Kelly, is then the fact to be proven, by those who claim under him. What evidence is required to prove marriage? It is, of course, according to the issue, according to the possibilities of making proof, according to the positions of the parties to the controversy. In this case, James Kelly's claim is precisely as if Greenberry Kelly were the plaintiff. The suit is brought by Greenberry Kelly himself, by means of his assignee, his marriage is a fact, one material fact in the case, he must know the truth of it, and must be held to strict proof of it, by such testimony as on any civil case, will prove an actual marriage.

Then the Eikelburner heirs cannot make good their claim by the evidence usually resorted to, and allowed to prove remote facts, in the establishment of a pedigree, because they claim directly from Greenberry Kelly, alleging that, by his death, in 1847, they have succeeded to his property; that he had title to it, in October, 1844, at the death of Clinton Kelly, being his grandfather, and heir. They have then to establish that allegation to be a fact.

The claim of each adverse party rests upon two facts, one that is common to them both, that Greenberry Kelly was the lawful father of Charles Kelly; the second fact in the one case, that he conveyed his interest to James Kelly, and in the other, it is that they are the proper heirs of Greenberry Kelly.

The effort of each being to vest an estate in Greenberry Kelly, from 1844 to 1847, the allegation of each being that Clinton

73BB

578            CASES IN THE SUPREME COURT

Kelly's Heirs et al. vs. McGuire and Wife et al.        [JANUARY

Kelly's estate was so vested, they must prove that he was the grandfather of Clinton Kelly, that is, that he was married to the mother of Charles Kelly. 2 *Stark. Ev.* (7th Am. Ed.) 833; *Remmington vs. Lewis,* 8 *Ben. Mon.* 611, 612; *Kuhl vs. Knauer and wife,* 7 *Ben. Mon.* 130; *Armstrong vs. McLonald,* 10 *Barb.* 300. But, upon the general rules of proving marriage in civil cases, no marriage is proven, according to the lowest requisites of the books. 2 *Greenl. Ev.* secs. 461, 462; 1 *do.* secs. 103, 104, 107; 1 *Ph. Ev.* 240, 248, (*Cow. & Hill's Ed.* 1843 e.); 2 *Stark Ev.*, Title Pedigree, 833, et seq.; *Vowles vs. Young,* 13 *Ves.* 143, to end of case; *Whitlock vs. Baker,* do. 414; *Monkton vs. Attorney General,* 6 *Cond. Eng. Ch. Rep.* 426, 438, from 2 *Russ. & Myl.* Greenberry Kelly's statements cannot be taken as evidence, as it would be allowing him to make evidence for himself. *Glynn vs. Bank of England,* 2 *Ves.* 42, 43. The books never have gone so far as to receive his declarations. 1 *Ph. Ev.* 240; 2 *Stark. Ev.* 839, and note; *Monkton vs. Attorney General, supra.*

The fact of his marriage is not incidental, it is the matter of issue; there is no evidence of any ceremony, none of co-habitation, or reputation, nobody has ever been acquainted with his wife, has even seen or heard of her, knows her maiden name, and there are, on the other hand, positive circumstances of suspicion, unlike *Jackson vs. Cooley,* 8 *John.* 131. See, also, 1 *Greenl. Ev.*, sec. 106. The case of *Clayton vs. Wardell,* 4 *Comst.* 230, and *Gaines vs. Relf,* 12 *How.,* were much stronger than this, in which the alleged marriages were adjudged not to be proven. In many of the foregoing relations, the character of this hearsay evidence, is commented upon. Also, see *Mima Queen vs. Hepburn,* 2 *Cond. Rep.* 498, from 7 *Cranch* 260; *Fosgate vs. Herkimer Man. and Hydraulic Co.,* 12 *Barb.* 358; *Stein vs. Bowman,* 13 *Pet.* 220.

III. If no marriage have been shown to make Charles Kelly and Mrs. Eikelburner legitimately related as brother and sister, the Eikelburner heirs cannot take an inheritance from Clinton Kelly, under the 3d section of the chapter of Descents—that section is as follows: "Section 3. Illegitimate children shall be cap-

able of inheriting and transmitting an inheritance, on the part of their mother, in like manner as if they had been legitimate of their mother." In support of this proposition, are cited *Stevenson's heirs vs. Sullivant*, 4 *Cond. Rep.* 640, 641, *from* 5 *Wheat.* 207; *Scroggin vs. Allen*, 2 *Dana.* 363; *Stover vs. Boswell*, 3 *Dana* 234; *Remmington vs. Lewis*, 8 *Ben. Mon.* 606, 608, 610; *Black vs. Cartnell*, 10 *Ben. Mon.* 188, 193, 194; *McCormick vs. Cantrell*, 7 *Yerg.* 615; *Brown vs. Kerby*, 9 *Humph.* 460.

IV. The Eikelburner heirs cannot recover, because if Greenberry Kelly were the lawful father of Charles Kelly, and if the half-blood could not inherit Clinton Kelly's estate, the grandfather would only take an equal part with Mrs. Eikelburner's descendants, and that is not the case made in the bill. *Sec.* 1, *ch. Descents, Dig.;* 4 *Kent* 408. This objection is not mended by the death of Greenberry Kelly, and the descent of his estate to the Eikelburner heirs, because, to meet such case, they should have claimed, as they would have derived one-half the estate directly from Clinton Kelly, at his death in 1844, and the other half from Greenberry Kelly, at his death, in 1847. For the consequences of his error, see *Kelsey vs. Western*, 2 *Const.* 506; *Roberts vs. Elliott*, 3 *T. B. Mon.* 397; *Price vs. Berrington*, 7 *Eng. Law & Eq. Rep.* 259, 260; *Maulding vs. Scott*, 13 *Ark.* 94, 95.

V. At all events, Mrs. Marsh and Mrs. McGuire must have the personal property of Clinton Kelly, as his next of kin, and distributees under the 1st section of the chapter of Descents, and under the 13th section. Whoever are cut off by section 12, are only cut out of inheriting real estate. Inherit and inheritance are the subjects of exclusion, and what is meant by them, is plainly written in section 20, to be real estate that has descended, and nothing else. Such, also, was the meaning of them at common law. So in the 22d section; the terms used in the 10th and 11th sections, are defined in the same way. Then, if the real estate of Clinton Kelly cannot descend to his sisters, his personal property must be distributed to them. For no rules, or canons of descent, ever impeded the flow of an intestates personalty, to

580      CASES IN THE SUPREME COURT

Kelly's Heirs et al vs. McGuire and Wife et al.     [JANUARY

his nearest relatives, whether of the half-blood or whole-blood. Such was the old common law, such has been the system under the statute of Distributions, in England, and such is the law in the United States. 2 *Black's* 491, 505, and notes 57, 58, *Wend. Ed.; Beeton vs. Darkin*, 1 *Vern.* 169; *Earl of Winchelsea vs. Norcliffe*, 1 *Vern.* 403, 437; *Crooke vs. Watt*, 2 *Vern.* 124; *Burnett vs. Mann*, 1 *Ves.* 156; *Pinkard vs. Smith, Litt. Sel. Cas.* 237, 338; *Karwon vs. Lowndes and wife*, 2 *Dessa.* 214; *Guerard vs. Guerard*, 4 *Dessa.* 406, 408; *Hallett vs. Hart*, 5 *Paige* 316; *Champion vs. Baldwin*, 1 *do.* 562; *South vs. South*, 3 *T. B. Mon.* 93; *Nixon vs. Nixon*, 8 *Dana.* 68; 1 *B. Mon.* 270; *Greenia vs. Greenia*, 14 *Mo.* 328.

VI. The conveyance from Greenberry Kelly to James Kelly, is void.

1. The subscribing witnesses do not establish it.

This must condemn the deed, unless there is a greater preponderance of proof than would otherwise be required, for the fact was forced upon James Kelly's representatives, that Greenberry Kelly's competency was the issue, and the testimony of the attesting witnesses is the most decisive. *Brook vs. Luckett's Exr.* 4 *How. Miss.* 482; 2 *Paige* 149, which defines the duty of attesting witnesses.

2. The weight of the testimony shows that Greenberry Kelly, when the conveyance was made, was utterly incompetent to know what he was doing. He was imbecile from disease, dissipation, and old age, without sense, discretion, reason, memory, or accountability. In this connection, the admissibility and weight of opinions, as evidence, will be discussed. *De Witt vs. Barley*, 13 *Barb.* 550; *Culver vs. Haslam*, 7 *Balf.* 314; *Lester vs. Pittsford*, 7 *Verm.* 161; *Morse vs. Crawford*, 17 *Verm.* 499; *Grant vs. Thompson*, 4 *Conn.* 203; *Porter vs. The Pequonnoc Manufacturing Co.*, 17 *Conn.* 257; *Rambler vs. Tryon*, 7 *Serg. & Rawle* 90; *Whitehurst vs. Hines.* 1 *Mun.* 547, 586, 587; *Brydges vs. King*, 3 *Eng. Eccl. Rep.* 113, 114, 135, *from* 1 *Hagg.* 256.

3. If Greenberry Kelly were not so imbecile as to avoid the

deed, the attendant fraud, and undue influence taken in connection with his old age, and feebleness of body and mind had that effect. *Bunch's admr. vs. Hurst's admr.* 3 *Dessa.* 291, 294; *Harvey vs. Pecks*, 1 *Mun.* 519, 526, 527; *Clarkson vs. Hanway*, 2 *P. Wms.* 203; *Clarke vs. Fisher*, 1 *Paige* 171; *Aff'd.* 2 *Comst.* 498; *Sears vs. Shafer*, 1 *Barb.* 412, 413; *Gartside vs. Isherwood*, 1 *Bro. Ch. Cas.* 561, 562; *Osmond vs. Fitzroy*, 3 *P. Wms.* 130, *and note* 1; *Ingram vs. Wyatt*, 3 *Eng. Eccl. Rep.* 179, 187, 190, *from* 1 *Hagg.* 389.

4. It belonged to James Kelly to clear the deed, and the transactions attendant of all suspicion, to show that everything was fair, for as the deed was procured by his agency, for his benefit, the presumption of law is against its honesty and validity. *Lansing vs. Russell*, 13 *Barb.* 523, *et seq.; Sears vs. Shafer.* 1 *Barb.* 415; *Billinghurst vs. Vickers*, 1 *Eng. Eccl. Rep.* 70, 72, *from* 1 *Phil.* 187; *Paske vs. Ollat*, 1 *Eng. Eccl. Rep.* 273, *from* 2 *Phil.* 323; *Ingram vs. Wyatt*, 3 *Eng. Eccl. Rep.* 170, 172, 174, 187, 188, 191, 193, 200, 204, 295, *from* 1 *Hagg.* 384.

VII. Greenberry Kelly's right to the property, as to him, could be be nothing more than expectancy, and was therefore for this, with the other circumstances, void. *Clarkson vs. Hanway*, 2 *P. Wms.* 203; *Twistleton vs. Griffith*, 1 *do.* 310; *Berney vs. Pitt*, 2 *Vern.* 14; *Nott vs. Johnson*, *Id.* 27; *Wiseman vs. Brake*, *Id.* 121.

Col. FOWLER and Mr. BYERS, also argued this cause for the appellees.

Hon. S. H. HEMPSTEAD, Special Judge, delivered the opinion of the Court.

Whatever may have been the original foundation of the right of property, it admits of no question that its protection, in some shape, is engrafted into the jurisprudence of every civilized nation. In most of them, it constitutes an important feature of their organic law. No government, however powerful, and who-

582 CASES IN THE SUPREME COURT

Kelly's Heirs et al. vs. McGuire and Wife et al. [JANUARY

ther free or despotic, could long command the affections and allegiance of its members, or preserve the order and tranquility of civil society, without respecting and securing this right, and affording adequate redress for its violation.

The transmission of property, whether by descent, succession, or purchase, depends upon the municipal regulations of each State, and no duty more delicate can be imposed on courts of justice, than to pass upon and enforce these regulations. It is for the judiciary to construe, not legislate; and when the real intention of the law-maker is ascertained, it must be declared, regardless of consequences. If cases are omitted, which ought to have been included, or hardships arise not foreseen, the remedy for the evil rests in the wisdom and discretion of another department. For us, it is sufficient to know, *ita lex scripta*.

This voluminous, and really difficult case, involves the construction of our statute of Descents—presenting questions not hitherto decided in our courts, and we can safely affirm, that they have been examined with care, diligence and patience. We have to thank the respective counsel for their very able arguments in the case.

The facts, as far as they have a bearing on the present branch of the subject, are, that, about the year 1810, Charles Kelly emigrated to what is now Arkansas; and, in 1815, married Mrs. Craig, a widow, who had two daughters by a former marriage, named Elizabeth and Emeline. Charles Kelly, an enterprising, shrewd, business man, aided by the prudence, skill, and good management of his wife, accumulated in Arkansas, where he lived, a large estate, consisting of real and personal property. He died intestate in 1834, and, by the law in force, his real estate descended, and his personal property was distributed to James De Witt Clinton Kelly, who was the only surviving issue of the marriage with Mrs. Craig. She died in 1836, and the son above mentioned, called, for brevity, Clinton Kelly, died intestate in Arkansas, the place of his domicil, in 1844, at the age of seventeen years, without having married and without issue, leaving, as claimants for

his property, his paternal grandfather, Greenberry Kelly, the descendants of Mary Eikelburner, his paternal aunt, and his two sisters of the half-blood, Elizabeth and Emeline; the first of whom is the present Mrs. Marsh, and the second, Mrs. McGuire.

The half-blood claim the entire estate of Clinton Kelly, real and personal, as his next of kin, and to the exclusion of all other persons.

We shall say nothing, at present, of Greenberry Kelly, or the Eikelburner heirs; because, if the pretensions of the half-blood to the whole, realty and personalty, should prove to be well founded, it would be an useless enquiry.

To form a new system of descents, will always be found a work of difficulty. Human wisdom is inadequate to making out and establishing a perfect one at once. It is quite impossible to foresee all the consequences of an attempt so important, extensive and ramified. Omissions and imperfections, however, as they are discovered, must be supplied and remedied by subsequent laws.

Excepting the first section, and some minor provisions, our statute of descents was borrowed from one in New York, but with additions not calculated to improve, and with attempts at brevity and perspicuity, neither happy nor successful. The original was, what it purported, and was intended to be, a pure statute of descents; using appropriate technical terms, regulating the inheritance of real estate, and not looking to the distribution of personal property at all. 2 *Rev. Statute, New York,* 750; *Digest* 436.

The first section of ours was extracted from some other statute of descents; amended by the revisers, by the interpolation of so much as relates to the distribution of personal estate; thus blending two subjects of a totally different nature, and governed by totally different rules. And it is this, which produces no small degree of difficulty in our system. We must, however, apply to it that universal rule of construction, that a statute should be so considered as that every clause, sentence, or part, shall stand, if possible; or, in other words, such construction as will best an-

swer the intention of the makers. 9 *Bac. Abr.*, STATUTE, *J.* 2, *J.* 5. General words or clauses in a statute, may be restrained by particular words, or clauses in the same statute. And when one section in a statute may be both general and particular, or where there are different provisions for different purposes, and penned in different words, in the same chapter, they ought to be so construed as to avoid inconsistency. *Id.; Campbell's case*, 2 *Bland.* 209. The application of these rules to the case in hand, will be readily perceived.

The 1st section is general and comprehensive, embracing all lands, whether ancestral or newly acquired, subject to certain exceptions and qualifications hereafter more particularly noticed, and these exceptions refer to real estate alone. This section also constitutes the table, by which real estate is to descend and personal property be distributed. As, by its express language, it relates to both real and personal property, it was manifestly the design of the Legislature, when there were descendants of the intestate, to send down both to them *per capita*, if in equal degree, and *per stirpes*, if in unequal degree, without any regard to the fact as to how the property had been acquired. And as to personal property, where there are no descendants of the intestate to distribute it to, collaterals will take in the same way as descendants, if there had been any: that is to say, without any inquiry as to how it was acquired, and, *per capita*, if in equal degree, and *per stirpes*, if in unequal degree. This was manifestly the design of the Legislature. The sections of the statute which have reference to both real and personal property, and expressly name or allude to both, or embrace them in their spirit, are the 1st, 4th, 5th, 15th, 16th, 17th, and 18th. The 15th, 16th, 17th, and 18th, touch the subject of advancement. And, to attain the object in view, it was necessary to blend real and personal property together; because the amount received is the inquiry; and, whether in land or personal property, produces the same result.

It may not be unworthy of remark, that neither in the 1st, 4th,

5th, nor in these sections, is the technical term ·"inheritance," used at all.

The 1st, 4th, 5th, 15th, 16th, 17th, and 18th sections, are the ·only ones designed, in our opinion, to apply to both real and per-·sonal· estate. All the rest embrace real estate alone.

The effect of the 1st section is, to constitute the persons, who take the personal property, whether *per capita*, or *per stirpes*, .and whether of the whole or half-blood, the absolute owners. Nor is it material, whether those persons are of the paternal or mater-·nal, or the lineal or collateral line. By that section, as already remarked, real and personal estate goes in the same channel, and if no subsequent provisions had been introduced, touching real ·estate, the precise bearing of which, it is probable the revisers ·did not perceive, our labors would have been comparatively easy. .At present, nothing further need be said as to personal property, ·as we shall find it necessary to allude to that hereafter, and shall :now speak in reference to real estate.

The effect of the 1st section, subject to the exceptions and quali-fications alluded to, is to vest an absolute ·estate of inheritance in lands in the person who takes. And every ·estate, interest and right, legal and equitable, in lands and tenements and heredita-ments, excepting only leases for years, and estates for the life of another person, are thus inheritable and descendable; or, ·as the 1st section expresses it, "having title to any real estate of inheri-tance," constitutes an inheritable estate, thus abolishing the com-·mon law doctrine, derived from feudal times, of actual seizin in the ancestor. Whoever claimed by descent, was bound to .show that he was heir to the first purchaser; and the seizin of the ·last possessor, from whom he claimed as heir, was· considered as presumptive evidence of his being·of the blood of the first pur-·chaser. It supplied the difficulty of investigating a ·descent from a distant stock, through a line of succession become ·dim by the lapse of ages. 4 *Kent* 386.

But, with us, ownership, or title to property, is substituted for :s·eizin; and that maxim *seisina facit stipitem*, of such controlling

74BB

consequence in the English scheme of descents, is entirely super-seded. By descent or hereditary succession, is understood the title whereby a person, upon the death of his ancestor, ac-quires the estate of the latter as his heir at law. 3 *Bac. Abr.*, *Descent* 104.

We pass now to the more particular consideration of the 10th section.

The manifest intention of the first part of this section, was to preserve ancestral estates in the line of the blood from whence they came. It was a partial adoption or recognition of the common law principle, which invariably followed the line of the blood. If the estate comes to the intestate by the father, or as it may be differently, and as well expressed, on the part of the father, then it must ascend to the father and his heirs, and thus overturning the inflexible rule of the common law, that an estate could never ascend; but should rather escheat to the lord. And so, if it comes by or on the part of the mother, it goes to the mo-ther and her heirs, in exclusion of the heirs of the father. In other words, it remains in the paternal or maternal line, from whence it was derived.

The expressions, "come by the father," or "mother," or on "the part of the father" or "mother," mean the same thing. *Maf-fit vs. Clark*, 6 *Watts & Serg.* 260. They are familiar to, and derived from, the common law, having an appropriate, technical meaning, which we must suppose the Legislature intended to adopt. They embrace not only the father, but all of the ancestors of the father, both paternal and maternal. *Co. Litt.* 12 *a*. When-ever, says Lord COKE, lands do descend from the part of the mo-ther, the heirs of the part of the father shall never inherit. And, likewise, when lands descend from the part of the father, the heirs of the part of the mother shall never inherit. *Co. Litt.* 13 *a*.

The 10th and 22d sections must be construed together, although the exact expressions used in the latter, are not contained in any part of the statute. But words of equivalent signification, are employed, and they are embraced within the spirit of the 22d

section.  Any other exposition would render the section entirely nugatory; and we must so construe statutes as that every part may have its proper effect, if possible.

The expression, then, "come by the father, or mother," is not limited to an estate acquired by descent merely; but includes an estate which comes to the intestate by gift, devise, or descent from the parent referred to, or from any relation of the blood of such parent.  Such is the letter and spirit of the statute.  In other words, there are two classes of cases provided for: one, where the blood of the person, from whom the estate came, whether it be by descent, devise, or gift, is regarded; and the other, where the blood of the intestate forms the *stirps*, or stock of descent, without respect to ancestral blood.

Chancellor KENT says there is a difference in the laws of the several States, between the succession to estates, which the intestate had acquired in the course of descent, or by purchase.  "If the inheritance," says he, "was ancestral, and came to the intestate by gift, devise, or descent, it passes to the *kindred*, who are of the *blood of the ancestor from whom it came*, whether in the paternal or maternal line."  4 *Kent* 404.

The portion of the 10th section, as to *new acquisitions*, gives the father and mother a life estate only, with remainder to the collateral heirs of the intestate: such as brothers and sisters, and their descendants, and so on.  A new acquisition, or newly acquired estate, does not afford, of itself, an exact idea of the mode of acquisition.  By the common law, there were two modes of acquiring an estate—distinguished by the general appellations of descent and purchase.  In the first, it was by operation of law; and, in the second, by act or agreement of parties.  Devises and gifts fall in the latter class.  An estate by purchase there became inheritable to the heirs general of the purchaser, first of the paternal, and then of the maternal line.  2 *Bl. Com.* 243.

It must be understood, however, that a new acquisition, in the sense intended by the statute, is one which the intestate has acquired by his exertions and industry, (*Brewster vs. Benedict*, 14

*Ohio* 385), or by will. or. deed from a stranger.   In other words, it is an estate derived from any source other than descent, devise, or gift, from father or mother, or any relative in the paternal or maternal line.   *Butler vs. King,* 2 *Yerg.* 116.

If the son should purchase land, from the father or mother, for a valuable consideration, it would be a new acquisition, and descend as such; because nothing is received by way of bounty at the hands of ancestors; which is the case as to lands descended from, or devised, or given by them to the intestate, and it was thought reasonable that they should remain in the blood from which they came.

Land is to be considered as having come from, or by, or on the part of, the father or mother, when it comes by gift, devise, or descent, either mediately or immediately from them, or from any person in their respective lines.   *Shippen vs. Izard,* 1 *Serg. & Rawle.* 223.

The 12th section provides that, "relations of the half-blood shall inherit equally with those of the whole-blood, in the same degree, and the descendants of such relatives shall inherit in the same manner as descendants of the whole-blood; unless the inheritance come to the intestate by descent, devise, or gift of some one of his ancestors—in which case, all those who are not of the blood of such ancestor, shall be excluded from such inheritance.

It has been contended, with much ability and ingenuity, that the restriction in the latter clause of the section, applies to the descendants of the half-blood only; and that such is the grammatical and logical construction.

But we are unable to subscribe to this argument.   It would be unsafe to construe a statute according to mere grammatical rules, or to rely on punctuation, as any material aid, in ascertaining the true meaning.   Neither bad grammar nor bad English, will vitiate a statute any more than a deed.   It is well known that ancient statutes were without sections or punctuation, and hence the reasonable and universal rule that the sense must be collected from the whole act.

It is clear that the meaning and intention of this section was to prohibit the half-blood, and their descendants alike, from sharing in the inheritance of an estate which might come to the intestate by descent, devise, or gift, from an ancestor; in all cases, *where they were not of the blood of such ancestor*. The reason for excluding the half-blood, is just as strong as for excluding their descendants, and it is impossible to conceive any well founded distinction between the two. And whatever opinion we might entertain, as to the hardships of such a rule, in any given case, or as to the impolicy of establishing lines of blood at all, in a new country, where almost every man is the architect of his own fortune and the stock of descent; yet the Legislature has spoken its will; the language is too plain to be doubted, and addresses a prohibition to the courts, not to be disregarded or evaded.

The half-blood are not excluded from inheritances, and they and their descendants may inherit even an ancestral estate, provided they can show they are of the blood of the ancestor from whom it was transmitted to the intestate. *Gardner vs. Collins*, 2 *Peters* 58. In newly acquired estates, they inherit equally with the whole-blood in the same degree.

HILLIARD, in his Treatise on Real Property, (*vol.* 5, 207), says: "In Arkansas, if there are no descendants, and the estate came from the father, it *passes to him and 'his heirs*. The half-blood and descendants inherit unless the estate is ancestral, in which case, *none inherit but those of the ancestral blood.*"

The word "blood," in its technical and natural sense, includes the half-blood. *Baker vs. Chalfant*, 5 *Wharton* 477. In a note, in the last edition of his commentaries, KENT says, "the words in the laws of the several States, regulating the descent of ancestral inheritances, require that the heir should be of the blood of the ancestor. This would, in the ordinary sense of the words, admit the half-blood, for they may be of the blood of the ancestor, though only half-blood to the intestate." The 12th section of our statute is an exact transcript of the 15th section of the New York Revised Statutes, and, in considering that section, he fur-

ther said that, *not being of the blood of the ancestor, was the only ground on which the half-blood was excluded from ancestral inheritances.* 4 *Kent* 404, *note b., and authorities there cited.*

In *Torrey vs. Shaw*, 3 *Edw. Ch. R.* 362, the Vice Chancellor, in commenting on a similar provision, observed that here is an exclusion as well where property comes by devise or gift—each of which is a species of purchase—as where it comes by descent; unless the parties claiming be of the blood of the donor. This proceeds, said he, upon the principle that the blood of the ancestor is necessary to enable collateral relations to take, where the property came from an ancestor by either of the modes of transmission spoken of.

In *Dew vs. Jones*, 3 *Halstead* 340, the half-blood of the person dying seized, was held entitled to inherit an ancestral estate; because he was of the half-blood to the person dying seized, as well as of the blood of the ancestor from whom the lands came.

Our statute provides for ancestral and newly acquired inheritances. The half-blood may inherit both, and will be excluded from the first only when lacking ancestral blood. With that exception, the half-blood and descendants stand upon the same footing with the whole-blood and descendants.

After carefully considering each of the provisions of the statute, and all together as a whole, we have come to the following conclusions:

1st. That, as to both real and personal property, it was the design of the Legislature, when there were descendants of the intestate, to send down both to them, *per capita, if in* equal degree, and *per stirpes,* if in unequal degree, without any regard to the fact as to how the estate was acquired.

2d. That, as to personal property, it was the design, where there were no descendants, that it should go to collaterals in the same way it would have gone to descendants, if there had been any: that is to say, *per capita,* if in equal degree, and *per stirpes,* if in unequal degree, and without enquiry as to how the property was acquired by the intestate.

3d. That, as to real estate, it was the design of the Legislature, where there were no descendants, to point out the lines of the succession, and that this is to depend on the fact, whether the inheritance is ancestral or new; and, if ancestral, then whether it come from the paternal or maternal line.

4th. If the inheritance was ancestral, and come from the father's side, then it will go to the line on the part of the father, from whence it came, not in postponement, but in exclusion, of the mother's line; and so, on the other hand, if it come from the mother's side, then to the line on the part of the mother, from whence it came, to the exclusion of the father's line.

5th. If the inheritance be not ancestral, but a new acquisition, then, after a life estate, reserved in succession to the father and mother, if alive, it will go in remainder, first to the line of the intestate's paternal uncle and aunts, and their descendants, in postponement of the mother's line, until the former becomes extinct; and then to the line of the intestate's maternal uncles and aunts, and their descendants; unless there should be kindred, lineal or collateral, who, either in right of propinquity, or by right of representation, stand in a nearer relation to the intestate than the uncles and aunts; in which case, such nearer kindred would take the inheritance to the exclusion of both of these collateral lines; and, in their hands, it would become an ancestral estate, and afterwards go in the blood of the relative from whence it came, in the ordinary course of descent prescribed for ancestral inheritances. *Digest*, secs. 10 *and* 11, *p.* 437.

6th. That, when the inheritance is fixed, by these facts, in any given line, it will pursue that line until it becomes extinct, and the objects of bounty, and the order in which they succeed one another, and the proportion they take, are to be ascertained by the 1st *section*, which is to be considered as the general table of descent. The father, mother, brothers, sisters, and so on, mentioned in that section, are those who are to be considered when counting from any propositus, whether the propositus of a single

line only, or the concurrent propositus of both lines, as the intestate is, as to personal property.

7th. In all cases where the inheritance is in any one line, it there goes in succession, *per capita*, if in equal degree, and *per stirpes*, if in unequal degree, precisely as if the other line was extinct, and precisely as the inheritance of a bastard would take a course in his mother's line, he having no father's line at all.

8th. The half-blood, and their descendants, take personalty, as well as realty, equally with the whole-blood, except that they are excluded from real estate when ancestral, if they lack the blood of the transmitting ancestor.

It is manifest, that Mrs. Marsh and Mrs. McGuire can take nothing in the real estate, which descended to Clinton from his father, Charles Kelly. They are excluded by an express provision of the statute, not because they are of the half-blood merely, but because the estate is ancestral, and they are not of the blood of the ancestor who transmitted it to the intestate.

On the same principle, the intestate's mother, and all his kindred on her side, are peremptorily excluded. It is, therefore, only his paternal kindred, who are called to the inheritance. And the intestate having left no children, or their descendants, and no father and no mother, no brothers or sisters, or their descendants, capable of inheriting, his grandfather, grandmother, uncles and aunts, and their descendants, of the blood of his father, Charles Kelly — from whom the inheritance came to him, and who held it as first purchaser, as an *ancient fee;* and was, therefore, the true stock of descent — were his next of kin called to the inheritance. Of these he left, him surviving, a grandfather, Greenberry Kelly, and the descendants of an only paternal aunt, Mary Eckelburner, and these descendants together, by the right of representation, were entitled to share the inheritance equally with the grandfather, under the general provisions made in the 1st section of the Statute. And the grandfather, having died after succeeding to this inheritance, these same descendants, of his daughter, Mrs. Eikelburner, as his lineal descendants, took the inheritance

from him, as his heirs of the blood of Charles Kelly, the first and last purchaser of the estate; and are, therefore, entitled to the entire real estate that descended from Charles to Clinton Kelly.

But, for the half-blood, it has been contended that the Eikelburner heirs cannot recover, because, conceding that Greenberry Kelly was the lawful father of Charles Kelly, and that the half-sisters would not inherit the estate, the grandfather would only take an equal part with Mrs. Eikelburner's descendants, and that this is not the case made by the bill; and, it is further urged that the objection could not be cured by the death of Greenberry Kelly, and the descent of his estate to the Eikelburner heirs; and that, to meet such case, they should have claimed, as they would have derived, one-half of the estate directly from Clinton Kelly, at his death, in 1844, and the other half from Greenberry Kelly, at his death, in 1847.

This position is not tenable, because the cross-bill states the facts fully in their proper 'order; and, with sufficient certainty, traces out the genealogy, and asks for general relief. Now, there can be no question of the soundness of the rule that it is only necessary to state the facts in a bill in chancery; and it tends to prolixity, and is generally improper to state matters of law; unless, perhaps, law and fact be so blended as to render it necessary. Under a prayer for general relief, the court may grant any that the facts stated will warrant, although it may be inconsistent with the special relief prayed. *Story's Eq. Pl.* 40, 41, 42; *Cook vs. Bronaugh*, 13 *Ark.* 183.

The personal estate, including the slaves of Clinton Kelly, stands on a different footing, as we will now proceed to demonstrate.

It may, perhaps, be regretted that the Legislature omitted to frame a separate law providing for the distribution of personal property to the next of kin in all cases, after the model of the English statute of CHARLES II, instead of resting it on a few general expressions, and a few sections in a statute of descents. However, we sit here to ascertain the legislative will, as best we can,

75BB

and, after moulding it into form and shape, to execute it; because the intention constitutes the law. 1 *Kent* 462; 15 *Johns.* 380.

As already remarked, the only sections of the statute, which name or refer to both personal and real property, are the 1st, 4th, 5th, 15th, 16th, 17th, and 18th. The 4th and 5th, are general, and were intended to legitimate children in certain cases, and the effect of them no doubt would be, to enable such children to inherit real, or take personal property precisely as if born legitimate. The other sections of the statute, were not, in our opinion, designed by the Legislature, to apply to or embrace personal property. They use technical terms of fixed legal import, applicable alone to real estate, such as "inherit," "inheritance," "descend," "descent," "ascend," "descendants," "heirs," "blood of the ancestor," "estate," and others of like import, not, properly speaking, applicable to personal property. When we speak of that, we speak of it as subject to distribution to the next of kin, and not as inheritable. We do not doubt that some of these terms, in common parlance, and even in judicial opinions, and in treatises by eminent juridical commentators, are sometimes, for the sake of convenience, applied to personal property, in a popular sense. That is the case with the term "estate," although it signifies the interest which a man has in lands. 2 *Bl. Com.* 103. Standing by itself, this is the idea it conveys; and hence some other word is generally used, when a different idea is to be expressed, such as "personal," or "moveable," and from which it receives a popular instead of a technical meaning. If technical words are used in a statute, they are to be taken in a technical sense, unless it clearly appears, from other parts of the statute, that the words are intended to be applied differently from their legal acceptation. 1 *Kent* 462.

Now, so far from that being the case, it is reasonably certain that the Legislature did not intend these terms to have any other than their legally received meaning; because, if so, it would have been easy to have expressed that intention in plain language. If terms and language are used in some sections, so as to require the in-

clusion of personal property, and not used in others, where, without them, such property could not be embraced either by the letter or spirit, the inference is irresistible that it was purposely omitted. There are other reasons for the exclusion equally cogent. Personal property is moveable from place to place, exists to-day and perishes to-morrow; while land remains the same, although the ownership may change with the seasons. In view of this difference, and out of deference to the common law, it is reasonable to suppose that the statute never designed to embrace personal property throughout. If so, inquiry would have to be made as to ancestral and newly acquired property, which, in many instances, could hardly be satisfactorily done, and, in some, not at all: and the litigation that would spring up from such a prolific source, would be truly alarming. Families would be plunged into open hostility with each other; the ties of blood and kindred severed, and the peace and quietude of domestic life disturbed by an unworthy scramble for property. When the administrator proceeds to make distribution of the moneys in his hands, would it not be truly absurd to talk about ancestral and newly acquired estates? From the very nature of the thing, would it not be almost, or quite, impossible to ascertain the facts, or apply such a rule? The statute of New York, from which ours was taken, would, in the absence of any thing else, be decisive of this question, because it was framed and adapted to the descent of real estate alone.

But, if any thing further was necessary to produce complete conviction, it is to be found in the 20th section of our statute, which expressly declares, that the term "inheritance," as used in the act, should be understood to mean real estate. *Digest*, 439. This is a legislative declaration which, in plain language, excludes the idea that personal property was intended to be embraced in any other than the sections alluded to, and also negatives the idea that the terms, therein employed, were used in a mere popular sense. No construction is to be indulged that would produce absurd consequences, or avoid a part of a statute: both of which would happen, if

personal property should be held to be included in all the .sections; whereas, by construing the 1st, 4th, 5th, 15th, 16th, 17th, and 18th, as alike embracing realty and personalty, and the others as extending to real estate alone, the whole statute has its proper effect, and each part may stand. And if there may be some omitted cases, or real and personal property may go to different persons, the remedy, for any supposed evil consequences, must be provided by the Legislature.

Now, under the statute of distributions, the half-blood are admitted equally with the whole-blood, for they are equally as near of kin. And so posthumous children, whether of the whole or half-blood, take equally as other children. 2 *Kent* 422, 424; 1 *Vernon* 437. Ever since the case of *Crooke vs. Watt*, 2 *Vernon* 124, it has been settled that, in the distribution of personal property, the half-blood should have an equal share with the whole-blood, as next of kin. *Smith vs. Tracy*, 2 *Mod.* 204; *Crooke vs. Watt*, *Shower's Parl. Cas.* 108. By the civil law, brothers and sisters of the half-blood are eqully next of kin with those of the whole-blood. A half-brother or sister, is of the blood of the intestate, because each of them has some of the blood of the common parent in his or her veins. *Gardner vs. Collins*, 2 *Peters* 87. This construction was put on the English statute of distributions more than a century ago, as appears by the case of *Crooke vs. Watt*, above cited, and has ever since been adhered to in England. The same construction appears to have been adopted in this country. *Gardner vs. Collins*, 3 *Mason* 403; *Hillhouse vs. Chester*, 3 *Day* 166; 2 *Yeates* 545; *Sheffield vs. Lovering*, 12 *Mass.* 490.

It follows from the premises, that Mrs. Marsh and Mrs. McGuire, sisters of the half-blood, and as next of kin to the intestate, are entitled *per capita*, share and share alike, to his whole personal estate, including slaves and their increase, to the exclusion of all other persons. And it necessarily follows, too, that no others than themselves, or those claiming in their right, could require an account for waste or mismanagement, or hold any one responsible in that regard. Manifestly, neither James Kelly, nor the

Eikelburner heirs, could be entitled to any relief whatever, as far as the personal estate is concerned, nor entitled to any account of it whatever.

We come now to enquire whether the conveyance, from Greenberry to James Kelly, was valid.

And first, it is to be observed, that the party to be charged in a contract, must not only express his assent that he will be bound, but he must be endowed with such degree of reason and judgment as to enable him to comprehend the subject. The assent, which is requisite to give validity to a promise, supposes a free, fair, and serious exercise of the reasoning faculty. *Chitty on Contracts* 134. The law presumes there is full capacity to contract, and mental incapacity forms an exception to the general rule; which must be shown by those who would set aside the contract. *Id.* 135.

It would be wholly impracticable to lay down any exact general rule as to incapacity to contract; because each case will be found influenced by its own peculiar circumstances. But it may be freely admitted that mere weakness of understanding, is not, of itself, sufficient to invalidate a contract, if the person is capable of comprehending the subject. The law does not seem to have attempted to draw any discriminating line by which to determine how great must be the imbecility of mind to render a contract void; or how much intellect must remain to uphold it. The difficulty of making such a discrimination, is apparent. *Jackson vs. King*, 4 *Cow.* 218.

While the solemn contracts between men, should never be disturbed on slight grounds; yet it may, perhaps, be assumed, as a safe general rule, that, whenever a person, through age, decrepitude, affliction, or disease, becomes imbecile, and incapable of managing his affairs, an unreasonable or improvident disposition of his property, will be set aside in a court of chancery. *In re James Barker*, 2 *John. Ch. Rep.* 232.

To analyze all the cases, on this subject, cited by counsel, would carry this opinion to an unreasonable length. The case of *Sears*

598          CASES IN THE SUPREME COURT

Kelly's Heirs et al. vs. McGuire and Wife et al.          [JANUARY

*vs. Shafer*, 1 *Barb*. 410, best accords with our idea of the true doctrine on this subject. If a contract is freely and understandingly executed, by a party, with a full knowledge of his rights, and of the consequences of the act, it must stand. This court disclaims all jurisdiction to interfere on account of the improvidence or folly of an act done by a person of sound though impaired mind. But, on the other hand, contracts have been set aside and cancelled, when want of consideration, or the improvident nature of the transaction has raised the presumption that fraud and misrepresentation were employed. *Shelford on Lunacy*, 267. When a gift is disproportionate to the means of the giver, and the giver is a person of weak mind, of easy temper, yielding disposition, liable to be imposed on, the court will look upon such a gift with a jealous eye, and strictly examine the conduct and behavior of the person in whose favor it is made, and if it can discover that any acts or stratagems, or any undue means have been used, to procure such gift; if it see the least speck of imposition, or that the donor is in such a situation with respect to the donee as may naturally give him an undue influence over him; in a word, if there be the least scintilla of fraud, a court of equity will interpose. 1 *Bro. Ch. R.* 560; 2 *P. Wms.* 208; 2 *Atk.* 325; 3 *P. Wms.* 130; 1 *Vesey Jr.* 19; 2 *Vernon* 189; 11 *Wheaton* 125; 1 *Barb.* 413.

Let us look, then, to the position of the parties and the circumstances of the case, and see whether any suspicious marks can be discovered, or any reasons exist why a court of equity should not lend its sanction to this contract; for, whoever sets up a contract, and invokes the aid of a court of equity to enforce it, must show that it is certain, fair, and just, and ought to be performed, or that the party should be enabled to reap the fruits it gives him.

The conveyance was made by Greenberry Kelly to James Kelly, his nephew, on the 20th of February, 1847, in consideration of love and natural affection, and purported to convey, without any reservation, all the real and personal property in Arkan-

sas or elsewhere, which had descended to the donor, or to which he was entitled, as the representative of his grandson, Clinton Kelly. The donor, at the time of this transaction, had passed the period usually allotted to human existence. He was in the last stages of second childhood, with his physical energies wasted, and his mental powers decayed. A century had passed over his head, and still he lived, as he had been living for at least twenty-five previous years—the recipient of the public bounty—an inmate of the poor-house—where, three months afterwards, he ended his long and profitless life. The hands of strangers smoothed his brow in death—the feet of strangers followed his remains to the grave. If he had not outlived his race, he appears to have outlived their affections.

Long before the execution of the deed, his memory was so impaired as to render him unconscious of events, and he appears to have been as ignorant of what was going on in the world, as if he had not existed at all. In stirring political times, when taken to the polls, to exercise the right of suffrage, he could not retain the names of candidates for whom he was expected to vote, although repeated to him over and over again, or, as one of the witnesses expressed it, repeated "an hundred times." It is true that the boisterous and riotous scenes of his early manhood shed their light, like a dim taper, on his memory, thus affording, perhaps, the strongest evidence of his old age. It is a wise dispensation that those, who are no longer capable of mingling in the active scenes of life, or appreciating its enjoyments, should not also be deprived of the happiness, incident to longevity, of re-perusing the volume of earlier life.

He was, undoubtedly, a very infirm and feeble old man—usually in bed—had been afflicted with general palsy for at least twenty-five years—was partially deaf—had been an intemperate man—would become intoxicated whenever opportunity offered—had been a county charge and under the control of keepers for about thirty years—was never known to have property; transact business, or make contracts—was indifferent to property, and in-

600        CASES IN THE SUPREME COURT

Kelly's Heirs et al: vs. McGuire and Wife et al.        [JANUARY

capable of managing or taking care of it. Surely, such a man must be the prey of the artful and designing, and is a fit subject of guardianship in a court of chancery. Indeed, the mind is shocked at the idea that such a man could understandingly dispose of a large estate, in a foreign jurisdiction.

These deductions will be found fully warranted by the evidence; and this, also, to have been the condition of the donor.

On the other hand, James Kelly, the donee, had hardly passed the prime of life, was a shrewd, enterprising, business man, strong minded, far seeing; and who had amassed a large fortune in trading and trafficking in the southern States. He was well calculated to have influence over a man in the condition of Greenberry Kelly, and seems not to have been over scrupulous in its exercise for the benefit of himself. He seems to have coolly calculated the prospect and chances of the death of Clinton Kelly, and to have kept an eagle eye on the property of the latter, until he acquired it by the deed in question.

These were the parties to the deed. The deed itself was drawn up by counsel employed and paid by James Kelly, was produced at the poor-house by him; the persons who witnessed it, went there at his instigation; it was read over—the old man was propped up in his bed—his hand steadied to enable him to make his mark—and, when accomplished, the centenarian sunk back on his pillow into the lethargy from which he was roused—the company collected for the occasion departed—the doors of the poor-house closed, and uncle and nephew saw each other no more.

To this instrument, there was four subscribing witnesses. Subscribing witnesses, it is said, are placed around a testator to ascertain and judge of his capacity. 3 *Mass.* 237, 330; 4 *Mass.* 593. Their attention is supposed to be directed to that point, and they may give their opinions in respect to the sanity or capacity of the testator. 1 *Greenl. Ev.* 440. James W. Bullock, who took the acknowledgment and subscribed as witness, after detailing the facts, gives it, as his opinion, that the conveyance was of very little value; meaning, as we understand it, that the capacity was

wanting. Wade B. Hampton, keeper of the poor-house, another subscribing witness, after adverting to various facts and circumstances, states his opinion to be, that a man of Greenberry Kelly's age, and as low as he then was, was not capable of making a contract. The other two subscribing witnesses do not establish the capacity to do the act, to our satisfaction.

The witnesses, who testify as to the incapacity of Greenberry Kelly, are about equal in number to those who speak as to his capacity; but we found our judgment on facts, circumstances, and acts detailed by the witnesses—holding, at the same time, opinions to be competent, in all cases where the object is to prove capacity or incapacity to make a contract, when the facts or circumstances are disclosed on which the opinion is founded. There are strong reasons for it. Human language is imperfect, and it is often impossible to describe, in an intelligible manner, the operations of the mind of another. We learn its conditions only by its manifestations, and these are indicated not alone by articulate words, but by signs, gestures, conduct, the expression of the countenance, and the whole action of the man. Nor is there any danger from such opinions, when the reasons for them are disclosed. The value and force of the opinion depend on the general intelligence of the witness, the grounds on which it is based, the opportunities he had for accurate and full observation, and his entire freedom from interest and bias. *Culver vs. Haslan*, 7 *Barb.* 321; *Clary vs. Clary*, 2 *Iredel* 78; *Wheeler vs. Alderson*, 5 *Hagg. Eccl. Rep.* 574, 604, 605; *Rambler vs. Tryon*, 7 *S. & R.* 92.

The instances, in which opinions are competent, are admirably and succinctly stated by professor GREENLEAF, in his treatise on Evidence. 1 *Vol.*, *sec.* 440; 13 *Barb.* 550.

It is worthy of reiteration, that James Kelly employed an attorney to draw the deed, and the donor, as we think, neither saw nor knew any thing of it until it was presented for execution. It was read over merely, but the effect of it was not explained; nor does it appear that the donor had any accurate conception of

76BB

of the value of the estate he was conveying, or the extent of his own right.

We have not overlooked the fact that one of the witnesses, J. J. Ashley, a relative of James Kelly, and subscribing witness to the deed, undertakes to show the contrary, by mentioning an inquiry made by the old man of James Kelly, when they all went into the room to execute the instrument, as to whether the deed produced was the one he, the old man, had requested James Kelly to have prepared; to which the latter, according to the statement of this witness, replied that it was. Now, other witnesses present, having equal opportunities of seeing and hearing all that transpired, heard no such inquiry or response, and they state there was no conversation on the subject before the execution of the deed. This witness too, after having made himself active in the service of James Kelly, in hunting up witnesses, and discovering testimony to sustain the deed, deliberately swears that he was indifferent in his feelings, and would as soon one party should succeed as the other. It is too plain to be questioned that he testified under a strong bias. This is manifest from his deposition, and no great degree of reliance is to be placed on his testimony, when opposed by many disinterested witnesses.

It is inferrible from the testimony, that, at previous periods, Greenberry Kelly had a vague idea that Clinton Kelly was rich; but if he knew or could recollect it at the time, it falls far short of that knowldge of the subject matter, which the law requires to render a contract valid, when executed under suspicious circumstances.

In short, after a careful examination of all the proof and circumstances, we cannot bring our minds to believe that he was in a condition to know, or had the capacity to comprehend the value of the estate, or the nature or extent of his rights, by any explanation that could have been made, and much less that he understood them from a single reading of a legal instrument.

The fact of a voluntary deed having been prepared by, or at the instance of the party, who takes a benefit under it, is gene-

rally considered a suspicious circumstance and raises a presumption of fraud, (*Shelford* 271; *Owen's case*, 1 *Bland's Ch. R.* 370; *Sears vs. Shafer*, 1 *Barb.* 415), and it is incumbent on a party, who sets up such a conveyance, especially when executed under suspicious circumstances, to show affirmatively that the transaction was fair and honest. *Sears vs. Shafer*, 1 *Barb.* 409.

Lord COKE, in enumerating the four different classes of persons deemed in law *non compos mentis*, puts in the second, a man who was of good and sound memory, and has lost it. *Beverly's case*, 4 *Co. R.* 124; *Co. Litt.* 247 a.

If a person, although not positively *non compos*, or insane, is yet of such great weakness of mind, as to be unable to guard himself against imposition, or to resist importunity or undue influence, a contract, made by him under such circumstances, will be set aside. And it is not material from what cause such weakness arises. It may be from temporary illness, general mental imbecility, the natural incapacity of early infancy, the infirmity of extreme old age, or those accidental depressions which result from sudden fear, constitutional despondency, or overwhelming calamities. And although there is no direct proof that a man is *non compos*, or delirious, yet, if he is of weak understanding, and is harrassed and uneasy at the time; or if the deed is executed by him *in extremis*, or, when he is a paralytic, it cannot be supposed that he had a mind adequate to the business which he was about; and he might be very easily imposed upon. 1 *Story's Eq.* 234; 1 *Fondbl. Eq.* b. 1, c. 2, s. 3. STORY lays it down, as a doctrine well established by authority, and as generally true, that the acts and contracts of persons who are of weak understanding, or who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justifies the conclusion that the party has not exercised a deliberate judgment, but has been imposed upon, circumvented or overcome by cunning, or artifice, or undue influence. 1 *Story's Eq.* 238; 1 *Bro. Ch. Rep.* 560, 561.

Without attempting to decide, on the present occasion, what

604        CASES IN THE SUPREME COURT

Kelly's Heirs et al vs. McGuire and Wife et al.    [JANUARY

exact degree of imbecility will vitiate a contract, we find no difficulty in saying that we cannot bring ourselves to believe that this conveyance was freely and understandingly executed by Greenberry Kelly, with a full knowledge of his rights, and the consequences of the act. The fact that he assigned a valuable estate, without making the slightest provision for himself, and when he, so much needed it; the fact that he was a passive instrument in the hands of the man who received the bounty, and to whom he was under no obligation; the fact, amply proved, that he was incapable of managing his affairs, or making contracts, stamp this conveyance as one which no man, in the possession of his faculties, would make on the one hand, and no fair man would accept on the other. 2 *Vesey Sen.* 155.

If such a deed could stand, we can hardly conceive of a case where a court of chancery would interfere to protect the feebleness of old age, or guard it against fraud and imposition.

This conveyance ought to be set aside and cancelled, and, as neither James Kelly nor his representatives show any right, otherwise than by the conveyance, it follows that their bill was properly dismissed, and the relief prayed by them denied.

The next question is, whether the descendants of Mary Eikelburner can inherit from Clinton and Greenberry Kelly. And this depends on the fact whether she was his legitimate daughter.

Hearsay, or, as it is generally termed, reputation, is admissible in all questions of pedigree. And the phrase, "pedigree," embraces not only descent and relationship, but also the facts of birth, marriage and death, and the times when these events happened. The entry of a deceased parent, or other relative, made in a Bible, family missal, or any other book, or document, or paper, stating the fact and date of the birth, marriage, or death, of a child or relative, is regarded as the declaration of such parent or relative in a matter of pedigree. Correspondence of deceased members of the family, recitals in family deeds, descriptions in wills, and other solemn acts, are original evidence, where the oral declarations of the parties are admissible. Inscriptions

on tombstones, and other funeral monuments, engravings on rings, inscriptions on family portraits, charts of pedigree, and the like, are also admissible, as original evidence of the same facts. 1 *Greenl. Ev.* 103, 104, 105; *The Berkley Peerage Case,* 4 *Campb.* 401, 418; *Jackson vs. Cooley,* 8 *John.* 128, 131.

Probably the only exceptions to the rule arise in prosecutions for bigamy, and in the civil action for criminal conversation. In these cases, from the very nature of the issue, an actual marriage must be established, and reputation will not suffice. 7 *John.* 314; 4 *Burr.* 2057, 2059; *Doug.* 171; 1 *A. K. Marsh.* 331; 3 *Phil. Ev.,* note 782, *page* 1147. Declarations of members, or relatives of the family, or general repute in the family, are good evidence to establish marriage, death, birth, heirship, and the like, and may be proved by others as well as surviving members of the family.

It would serve no useful purpose to reproduce, in this opinion, the testimony on this point, but it will suffice to state its effect.

It is proved, by the repeated declarations of Greenberry Kelly, running back thirty or forty years, that he was married in Pennsylvania, and by that marriage, had two children, Charles and Mary; that he separated from his wife in Chilicothe, Ohio, she remaining there and keeping the daughter Mary, and he emigrating to Clark county, Kentucky, and taking with him his son, Charles. He always recognized these as his legitimate children; they recognized him as their father, and recognized each other as brother and sister. The marriage, and legitimacy of these children, were spoken of and known in the family, and no doubt was expressed as to the one or the other. In the community, they were received and regarded as the lawful children of Greenberry Kelly, by a lawful marriage.

Considering the great lapse of time, and the fact that the parties were in the humbler walks of life, it would not be expected that any better evidence could be produced; and, indeed, it is matter of surprise that such an amount of it has been brought forward, sufficient at least to prove the marriage of Greenberry Kelly, and

the legitimacy of Charles Kelly and Mary Eikelburner, as his children. On these points, we entertain no doubt.

Greenberry Kelly having inherited one-half of the realty from his grandson Clinton, as his lineal heir, and having died intestate without making any valid disposition of it, and Mary, his daughter, who inherited the other half, as paternal aunt, having died before him leaving children, the entire estate went to those children who were living, and to the issue of such as were dead, *per stirpes*, under the statute of descents.

It is proved that Mary Eikelburner and Jacob Eikelburner intermarried; that they removed to Naples, in Illinois, in 1831; and both died within a few days of each other, in 1833 or 1834, leaving as children then surviving, as follows: *First*, Louisa McKee, wife of James McKee, who died without issue, in about 1836, and he about 1838; *second*, Martin Eikelburner, who died, in 1839 or 1840, leaving a wife and only child, a son named William Eikelburner. The widow married a Mormon, named Weaver, and has since died; *third*, Frances Nutt, wife of John F. Nutt, of the State of Ohio; *fourth*, Martha Ann Cobb, wife of Orrin Cobb, of Pike county, Illinois; *fifth*, Mary Jane Puttz, wife of Abraham Puttz, also of Pike county, Illinois.

William Martin Eikelburner, Frances Nutt, Martha Ann Cobb, and Mary Jane Puttz, the first, the great grandson, and the others, the grand-daughters of Greenberry Kelly, were his heirs, and inherited the portion of the real estate, *per stirpes*, which had ascended to him from his grandson, Clinton Kelly, as well as the portion that had ascended to their ancestor, Mary Eikelburner.

It appears, by the pleadings in the cause, that, by deed bearing date the first day ot May, 1846, from John F. Nutt and Frances, his wife, to Edwin R. McGuire, for the condsideration of $1,800, the latter succeeded, by purchase, to the rights of Nutt and wife in the estate.

The other heirs filed their cross-bill, claiming the whole real and personal estate, except the part conveyed and assigned to McGuire; and prayed, among other things, that their title to the

estate might be established, confirmed and quieted, and a partition and division be had, between them and the assignee of Nutt and wife, according to their respective interests, and that if division could not be equitably and fairly made, that the property be sold and the proceeds divided, and the conveyance to James Kelly be brought into court and cancelled; that a receiver be appointed, to take charge of the lands and slaves, and for general relief.

Now, for reasons already suggested, they had no claim to the personal estate of Clinton Kelly, and consequently, were not authorized to call any one to account in respect to it; and, so far as that was concerned, the relief asked was properly denied. But, as to the real estate, a partition thereof should have been decreed according to the prayer of the bill, giving one-fourth to each one of the heirs above named, and one-fourth to the above named assignee; and commissioners should have been appointed, and the division made according to law and the rules and practice of a court of chancery. And if partition could not be made, without great prejudice and injury to the owners, to decree the sale thereof according to law.

John Ringgold, administrator of Charles Kelly, and Joseph H. Egner, guardian of Clinton Kelly, filed pleas supported by answers, averring, in substance, the final settlement and confirmation of their accounts as administrator and guardian, respectively, by the probate court; that there was no fraud therein, and prayed the benefit thereof in bar of the relief sought against them by Kelly's heirs, and the Eikelburner heirs.

These pleas appear to have been set down for argument, and to have been disallowed, and no further steps taken with regard to them. It is said that the effect of overruling a plea, is to impose upon the defendant the necessity of making a new defence. This, the defendant may do either by a new plea, or by an answer, and the proceedings upon the new defence will be the same, as if it had been originally made. 2 *Daniell's Ch. Pr.* 802. And, after a plea has been overruled, the same defence may be

insisted on by way of answer. *Goodrich vs. Pendleton*, 4 *Johns. Ch. R.* 549.

But we shall not find it necessary to make any inquiry as to the sufficiency of the pleas, or the action of the court upon them, because, as already stated, the subject matter to which those pleas related, was one in which James Kelly, nor his representatives, nor the Eikelburner heirs, had any interest.

Mrs. Marsh and Mrs. McGuire, who succeed to the whole personal estate and slaves of Clinton Kelly, *per capita*, are the only persons, who had the right to call for account in respect to that property. They have not complained, nor asked for an account, nor attempted to surcharge or falsify the settlements made by either Ringgold or Egner.

Every case in chancery, when it comes to a hearing, should be so fully prepared as to enable the court to render a final decree as to all parties, and all interests involved, and thus put an end to litigation speedily. In this, the object of all appears to have been to try the question as to who would take the personal, and who inherit the real estate; losing sight of details of some importance, and thereby protracting litigation, and imposing additional labor on this court.

Every case brought into the appellate court, should be so perfect in preparation, as to enable us to render such decree as the inferior court should have rendered, and so as to fully adjust the rights of litigants.

It appears that Edwin R. McGuire was appointed receiver in the case, on the 2d of June, 1848, to safely keep the property in litigation, and hold the same subject to the order and decree of the court, and entered into bond with security, in the sum of $8,000, conditioned for that purpose, payable to the lawful heirs of James D. W. C. Kelly.

A receiver is an officer and representative of the court, and subject to its orders, and is, at all times, entitled to its advice and protection. 3 *Daniell* 1949; *Cammack vs. Johnson*, 1 *Green Ch. R.* 163, 173. Property placed in the hands of a receiver, is con-

sidered as in the custody of the court. The possession of the receiver is that of the court, and any attempt to disturb it, without leave of the court first obtained, will be a contempt on the part of the person making it. 3 *Daniell* 9; *Vesey* 335; 8 *Paige* 388; 2 *Story's Eq.*, sec. 833 *a*, 833 *b*; 7 *Paige* 513.

Now, before the final decree, the court should have required the receiver to report his actings and doings under his appointment; and to render an account according to the usages and practice of a court of chancery. And this was necessary to ascertain the condition of the property placed in his hands; and how he had discharged the trust; and to enable the court, in its final decree, to settle the rights and do justice to all the parties in a conclusive manner.

The decree of the court is silent on that subject, thus leaving the property in litigation where it had been placed, and making no disposition of it. In that, the decree falls short of doing justice to those entitled to the property. It was surely important for the court to have had accounts taken; to have had the administratorship of Clinton Kelly, which had been brought into the Circuit Court by this proceeding, adjusted and settled, and distribution made to Mrs. Marsh and Mrs. McGuire; and also to have decreed a partition of the real estate, which Clinton Kelly owned or possessed at the time of his death, as prayed by those heirs in their cross-bill.

If the record contained the requisite facts and information, upon which this court could render such a decree, it would proceed to do so without hesitation. To attempt it, however, we would run the risk of doing injustice to some, and falling short of the measure of justice to others. All we can do, is to express our views; remand the cause, with such directions as will most probably enable this whole controversy to be finally settled between the parties litigant, according to the principles of equity, and right, and justice.

On the whole case, we are of opinion that, so much of the de-

77BB

**610** CASES IN THE SUPREME COURT

Kelly's Heirs et al. vs. McGuire and wife et al.          [JANUARY]

cree as dismisses the bill and amended bill of James Kelly, ought to be affirmed with costs.

The decree, dismissing the cross-bill of the Eikelburner heirs, is erroneous, and must be reversed with costs, and the case be remanded, with the following directions :

*First*, That Edwin R. McGuire, the receiver in the case, be required to account as to the property placed in his hands, in such manner as to the court shall seem equitable and just, and required to surrender the same for the purpose of division and distribution.

*Second*, That the administratorship of James De Witt Clinton Kelly, be adjusted and settled finally, and that the slaves, moneys, assets, and all his personal property, be distributed, equally, share and share alike, to the said Elizabeth and Emeline, half-sisters of said James De Witt Clinton Kelly, in such manner as shall be just and equitable, and legal, and that this be speedily done.

*Third*, That all the real estate, of which James De Witt Clinton Kelly died possessed, or of which he was owner, or to which he had title, mentioned in the pleadings in this cause, be divided, and partitioned by decree into four parts, according to the prayer of the cross-bill of Cobb and wife, and others, one part to Martha Ann Cobb, one part to Mary Jane Puttz, with their husbands ; one part to William Martin Eikelburner ; and one part to Edwin R. McGuire, as assignee of John F. Nutt and Frances, his wife, and that their title be quieted, and that they hold as tenants in common.

*Fourth*, That, if division and partition cannot be made without prejudice to said heirs, that the court decree a sale according to law.

*Fifth*, That the deed of conveyance from Greenberry Kelly to James Kelly, dated 20th of February, 1847, be canceled and declared void.

A decree will be entered in this court, carrying out the above directions according to law and equity, and the court below will proceed in the case in a speedy manner, and not inconsistent with this opinion.