Lotz, J.
The appellant, Mary A. Rountree, as ad *524 ministratrix of the estate of Mary D. Gilkey, deceased, filed her petition in the Montgomery Circuit Court and asked the court to order a distribution of certain moneys in her hands to the persons lawfully entitled thereto. A day for the hearing of such petition was fixed and notice thereof duly issued. The appellee Essie Pursell appeared and filed an answer claiming to be entitled to. a distributive share of said estate. The court tried the issues and made a special finding of the facts and stated conclusions of law thereon. .
The facts as found are, substantially, as follows:
Daniel Gilkey died testate in Montgomery county, Indiana, the 20th day of April, 1884. By the terms of his will he made certain specific bequests, and the residue •of his property he devised and bequeathed to his daughter, Mary D. Gilkey, his only child. William P. Herron became the executor of the will, and as such executor he settled the estate in accordance with the terms of said will and was discharged from the trust June 25, 1885.
Mary D. Gilkey, the residuary devisee and legatee, was a minor, nine years of age, when Daniel Gilkey died. Samuel W. Austin was appointed and became her guardian May 8, 1884. As such guardian Austin received of Herron, executor, personal property of the ostensible value of $25,229.86. Of this sum $10,009 consisted of notes, accounts, judgments, and cash; $7,-000 of seventy shares of the capital stock of the First National Bank of Crawfordsville, Indiana, at its face value, and $10,500 at its appraised value; $4,700 of four per cent. United States Government bonds; $20 of four shares of the capital stock of the Montgomery County Union Agricultural Society, of the face value of $25 per share.
Some of the notes, accounts, and judgments were worthless, and the probable value of the whole personal *525 estate received by tlie guardian was about $21,000 or $22,000.
Daniel Gilkey, at his death, owned real estate in Montgomery county, Indiana, of the probable value of $15,000, which, by the terms of his will, went to Mary D. Gilkey, and she died the owner thereof by virtue of the devise.
The guardian of Mary D. Gilkey, prior to her death, collected all the notes, accounts, claims, demands and choses in action, which he had received from Herron, executor, except a few worthless and uncollectible claims which were of no value.
During the existence of the guardianship,, the guardian, as such, collected and received large sums of money, as interest, the exact amount of which is unknown. He collected as dividends on bank stock large sums of money. He collected large sums of money as interest on United States bonds, and he sold the United States bonds for $5,922, of which sum $1,220 was premium, the amount received in excess of the face value of the bonds. He collected and received, as cash rents from the real estate, about $6,000. He sold wheat, corn, hay and other personal property, raised on or taken from the real estate, and realized from such sales a large sum of money. He collected and received in cash from other sources about $19,600.
The money received by Austin, as guardian, which was not received by him from Herron, executor, was ■money derived from the income of the estate of Mary D. Gilkey, his ward, and the personal estate received from the executor.
Samuel W. Austin kept an account of his receipts and expenditures, as guardian, in the First National Bank, of Crawfordsville, Indiana, in the name of his ward, Mary D. Gilkey. In this acconnt Mary D. Gilkey *526 was credited with, all sums received by her guardian, and was charged with all sums expended on her account, and with loans made by him out of her funds.
The money so collected and received by Austin, as guardian, was commingled, and no separate account or memorandum hvas kept by. which one part could be identified from the other. Much of it was re-invested in new loans to different parties, and new notes and obligations taken therefor, in the name of said guardian,, from other persons than those who were originally indebted to the estate. Out of the moneys so collected and received, the expenses of the care, education and support of the ward and of the guardianship; the taxes of the real and personal estate of the ward, and various costs- and expenses were paid.
Mary D. Gilkey died in Montgomery county, Indiana, August 2, 1892, intestate, and under the age of twenty-one years. September 17, 1892, Austin made liis final settlement as guardian and paid into court as the balance of funds in his hands the sum of $7,744.14 in cash, and turned over notes to the court to the amount of $6,011, and also turned over to the court the seventy shares of the capital stock of the First National Bank, of Crawfordsville, Indiana, of the face value of $7,000, and the four shares of stock of the Montgomery County Union Agricultural Society of the value of $20.
The personal property and assets, turned over by the said Samuel W. Austin, as guardian, in his final settlement, were less in amount and value than came into his hands from said William P. Herron, executor, and the expenditures of the guardian, allowed by the court, exceeded the income, rents, dividends, and interest received by him from the real and personal estate of Mary D. Gilkey. The costs and expenses of the trust were greater than the income therefrom.
*527 Mary D. Gilkey died without issue and left, surviving her, neither father nor mother, brothers or sisters, or their descendants, but left surviving her a sister of Daniel Gilkey, deceased, anda number of descendants of his deceased brothers and sisters.
Julia Gilkey, the mother of said Mary D. Gilkey, died in November, 1876. The appellee, Essie Pursell, is the daughter of a deceased sister of Julia Gilkey, and is the owner, in her own right and by assignment, of the interest of all the heirs on the mother's side in the estate of Mary D. Gilkey.
Mary A. Rountree, as the administratrix, asked an order of court authorizing and directing her to distribute among the parties entitled thereto the sum of $9,000, derived from the cash and assets turned over by Austin, as guardian, not including the bank stock or the stock of the agricultural association or any part of either.
The heirs of the paternal line claim that they are entitled to the whole of this sum, and that the heirs of the maternal line have no right to share in the distribution.
On the other hand, Essie Pursell claims that the heirs of the maternal line are entitled to take one-half the sum, and that she, as heir and as assignee of the interests of all the other heirs of the maternal line, is entitled to that half.”
The court below, in its conclusions of law, decided in favor of Essie Pursel, and rendered judgment accordingly.
The appellants insist that the court erred in its conclusions of law.
The controversy in this case arises upon the construction of the statutes regulating the descent and distribution of estates of deceased persons, and particularly of the first subdivision of section 5 of the act approved May 14, 1852, being section 2626, Burns Rev. 1894, and sec *528 tion 2741, R. S. 1881. That act is entitled “An act regulating descents and apportionment of estates.” The first five sections, being sections 2622 to 2626, Burns Rev. 1894 (sections 2467 to 2471, R. S. 1881), are as follows:
“1st. The real and personal property of any person dying intestate shall descend to his or her children in equal proportions; and posthumous children shall inherit equally with those born before the death of the ancestor.
“2d. If any children of such intestate shall have died intestate, leaving a child or children, such child or children shall inherit the share which would have descended to the father or mother; and grandchildren and more remote descendants and all other relatives of the intestate, whether lineal or collateral, shall inherit by the same rule: Provided, That if the intestate shall have left, at his death, grandchildren only, alive, they shall inherit equally.
“3d. If any intestate shall die without lawful issue or their descendants alive, jone-half of the estate shall go to the father and mother of such intestate, as joint tenants, or, if either be dead, to the survivor, and the other half to the brothers and sisters and to the descendants of such as are dead, as tenants in common.
“4th. If there be neither father nor mother, the brothers and sisters of the intestate living, and the descendants of such as are dead, shall take the inheritance as tenants in common. If there be no brothers or sisters of the intestate or their descendants, the father and mother shall take the inheritance as joint-tenants; and if either be dead, the other shall take the estate.
“5th. If there be no person entitled to take the inheritance according to the preceding rules, it shall descend in the 'following order:
‘ 'First. If the inheritance came to the intestate by gift, *529 devise, or descent from the paternal line, it shall go to the paternal grandfather and grandmother, as joint tenants, and to the survivor of them; if neither of them be living, it shall go to the uncles and aunts in the paternal line, and their descendants, if any of them be dead; and if no such relatives be living, it shall go to the next of kin, in equal degree of consanguinity, among the paternal kindred; and if there be none of the paternal kindred entitled to take the inheritance as above provided, it shall go to the maternal kindred in the same order.
“Second. If the inheritance came to the intestate by gift, devise, or descent from the maternal line, it shall go to the maternal kindred in the same order; and if there be none of the maternal kindred entitled to take the inheritance, it shall go to the paternal kindred in the same order.
“Third. If the'estate came to the intestate otherwise than by gift, devise, or descent, it shall be divided into two equal parts, one of which shall go the paternal and the other to the maternal kindred, in the order above described; and on the failure of either line, the other shall take the whole.”
It is conceded that the property sought to be distributed did not come to Mary D. Gilkey by descent, but through the will of her father. The appellant contends that the property came to Mary by either gift or devise, and that the persons to whom it should be distributed must be determined by the same rule as applies to real estate under the same circumstances.
The appellees insist that the property did not come to Mary, either by gift or devise; that if it did it was never the intention of the Legislature to impart to personal property an ancestral character or quality; that in any *530 event the original property given or devised has lost its identity and character by the many transformations which it has undergone.
Mary D. Gilkey died intestate, unmarried and without issue. The direct line of her father’s blood became extinct with her. The devolution of the property of which she died seized or possessed, depends upon the manner of its acquisition and the sources of hef title. If the property came to her by gift, devise, or descent, it must go to the persons designated in the first and second subdivisions of section 5 above set out. Strictly speaking, a gift is not a devise nor a devise a gift, and property which came by descent could not have,come by either gift or devise. To give is to transfer the ownership of property from one person to another gratuitously, without an equivalent or consideration. A gift is the thing transferred. Delivery or placing the donee in possession of the thing given is one of the necessary elements of a valid gift. The word ‘ ‘gift’ ’ ordinarily applies to personal property only, but in its larger signification it applies to either realty or personalty.
The usual phrase of testamentary disposition is, “I give, devise and bequeath.” The word “gift” is well adapted to such disposition for the ruling motive of the testator is to confer property rights upon another gratuitously and of his own free will. Allen v. White, 97 Mass. 504; Schouler on Wills, section 3.
The word “devise” ordinarily relates to real estate acquired through a will. It is a gift by will of real estate, and can not, with legal precision, be applied to things personal. The appropriate term in disposing of personalty by will is “bequeath,” and a bequest is a gift by will of personal property, but in order to favor the manifest intent of the testator, as shown, by the context of *531 tlie will, the courts often construe the word “bequest” tornean “devise” and “devise” to mean “bequest.”
The same rule prevails in the construction of statutes in reaching the legislative intent. The word descent ordinarily applies to the devolution of real estate. But all of these words and the phrase “gift, devise, or descent” may be so used as to indicate the manner of the devolution of both real and personal property, or of personalty alone.
This is well illustrated by section 2649, Burns Rev. 1894 (section 2488, R. S. 1881), where it is provided that “The personal property of the wife held by her at the time of her marriage, or acquired, during coverture, by descent, devise, or gift [or in any other manner], shall remain her own property to the same extent and under the same rules as her real estate so remains; and on the death of the husband before the wife '* * , shall be distributed in the same manner as her real estate descends, and is apportioned under the same circumstances.” Personal property is the principal subject-matter of this section, and it clearly appears that the legislature contemplated that such property might be acquired by devise and by descent. The word “descend” ordinarily means to go down. An ancestor primarily means one who goes before: a progenitor. But in the law relating to the devolution of property rights, “descend” may mean “ascend,” as “descending in the ascending line,” and a son may be the ancestor of his father. There is much confusion of terms and of ideas. The Roman law of succession more properly describes the modern devolution of property than our terms of descent and distribution. Whilst these words may be wrenched from their usual acceptation, the power of the Legislature to give them another meaning can not be denied..
We are of the opinion that by the use of the term *532 “gift, devise or descent,” it was the legislative intent to include all property, either real or personal, that came' to the intestate without an equivalent or consideration being paid therefor. These terms embrace all the methods by which title to property can be legitimately acquired without giving an-equivalent for the same. It is the destination of property thus acquired that is sought to be controlled by directing it back to the sources whence it came.
Mary D. Gilkey became the owner of the property as a gratuity, through her father’s will, and it should all go to the paternal line unless some other causes exist which control its destination.
If the statutes of this State do not give to personal property an ancestral character, then it will not go to the paternal to the exclusion of the maternal line, although it came to the intestate by gift or devise. This presents the most important question in the controversy. In the first section above set out it is expressly providéd that the real and personal property shall descend, and that posthumous children shall inherit. It is personal property as well as real that is the subject of the enactment. In the subsequent sections the terms ‘ ‘descend, ’ ’ “shall go to” and “inherit” are used synonymously. .
The same is true of the words “estate” and “inheritance.” The words “descend,” “inherit” and “inheritance” ordinarily relate to real estate. The same is true of the terms “tenants in common” and “joint tenants.” Whilst this is true it is in the power of the Legislature to give them a different inflection and to expand their meaning. The words “descend,” “inherit,” and “inheritance,” in their broader meaning, are frequently applied to personal property. Whilst some confusion exists in the terms used, we think it clear that the enactment governs the descent of real estate as well as the *533 distribution of personalty. This much is clear, that v/hen personal property has reached that point when the law undertakes to divide it among the persons entitled to it, it shall be divided in the same manner and into the same parts, and to the same persons that real estate is divided when it descends. We have no other statute in this State regulating the distribution of the surplus of the estate of an intestate. And we have no other enactment regulating the descent of the real estate of an intestate. Descent and distribution are combined in the same act. These terms, which are peculiarly applicable to real estate, such as “joint tenants” and “tenants in common,” may be construed to have their full force in so far as the act is a statute of descent, and inapplicable in so far as the act is one of distribution of personalty. It is no unusual thing in the history of the legislation of this State and country regulating the descent of realty and the distribution of personalty to combine both in the same act. Indeed, this is the most natural method considering the character of our people and our institutions. The ordinance of Congress, passed in 1787, governing the Northwest territory, of which Indiana then formed a part, regulating the disposition of the property of intestates, was both a statute of descent and of distribution, R. S. 1843, p. 20.
The same is true of the first law bearing upon this subject, passed by the first General Assembly after Indiana became an independent State. Acts 1816, p. 141.
The same combination is found in the act of January 2, 1817. Acts 1818, p. 183, R. S. 1824, p. 154, and in the act of January 29, 1831, R. S. 1831, p. 207, and also in the act of February 17, 1838, R. S. 1838, p. 236.
The first separation between the statutes of descent and distribution occurred in 1843.
*534 In that year the descent of real estate, and the distribution of personal property were embraced in separate enactments. R. S. 1843, p. 432 and p. 552. This separation continued until the enactment of the present law in 1852, when they were again combined in one. It does not necessarily follow that because the succession to property rights in real and personal estate is commingled in the same act that an ancestral quality is given to each kind, although it must be conceded that such combination lends some support to the contention. In construing statutes, we must bear in mind the former laws both common and statutory, and we often find ourselves materially aided' by approaching the subject from the side of history.
There is no branch of the law in which more conservatism is found than in that relating to the succession to property rights. Every change has been stubbornly resisted, and the present laws are the result of ages of slow and gradual development. It is not to. be expected that a modern legislative body will disregard this conservative tendency. A brief allusion to the history of intestate succession may be of. assistance. In ancient times, and among barbarous people, the family seems to have been the unit of society. The family was an entity something akin to the modern -corporation. The father or patriarch was the head or ruler, and its members were bound together for mutual protection. No member of the family, not even the head, had any absolute right to property. It belonged to the family. Upon the death of the head or any member, the family succeeded to his property rights. As the family might adopt persons not of the same blood, blood relationship was not of controlling importance in the devolution of property. As society gradually advanced the rights of the individuals, composing the family, became more prominent, and the *535 later Romans undertook to regulate intestate succession by basing it largely upon blood relationship. Maine’s Ancient Law Chap. V and VI, Hunter’s Roman Law ■649. The Roman laws applied to both real and personal property. The degrees of blood relationship as fixed by them form the basis of all modern legislation for'the distribution of personal property. The feudal system introduced another theory for the devolution of lands and landed property, but it did not undertake to regulate the disposition of personal property. That system was founded upon military services, and sprang from the martial genius of its adherents. With some modifications it became the common law of descent in England. By it actual sezin or seizin in deed was indispensable to the inheritable quality of estates. If the ancestor was not seized no matter how clear his right of property the heir could not inherit.
According to the canons of descent hereditaments descended lineally, but could never ascend. This rule was applied so rigidly that it was said “the estate would rather escheat than violate the laws of gravitation.” The oldest son was admitted to the inheritance to the exclusion of his brothers and sisters, and males before females. Lineal descendants in infinitum .represented their ancestors, standing in the same place the ancestor would have stood if living; and on failure of lineal descendants the inheritance descended to the collateral relations—being of the blood of the first purchaser—subject to the preceding rules. The collateral heir of the intestate was required to be his collateral kinsman of the whole blood. In collateral inheritances the male stock was preferred to the female, and kindred of the blood of the male ancestor, however remote, was admitted before those of the blood of the female, however near, unless the lands in fact descended from a female. Watkins on *536 Descents, 95. These canons of descent had two leading purposes in view, the first, to preserve the inheritance in the blood of that family by whom it was originally acquired; the second, to preserve the inheritance entire by keeping for the time being in a single representative of that family by which it was acquired. These rules tended to prevent the diffusion of landed property and to promote its accumulation in the hands of the few. In this manner a landed aristocracy was builded up. Rank and wealth became a bulwark of the throne and the king and aristocracy gave to each other mutual support.
After the separation of the American colonies from the mother country another system was introduced. It was equality before the law. Primogeniture was abolished. The elder son was no better than his brothers and males no better than females. It is this principle of equality that lies at the foundation of our civil institutions. The common law did not recognize any inheritable quality in personal property except as to heirlooms, and these, strictly speaking, were attached to the freehold. Heirlooms are not recognized by the laws of this country. 1 Wash. R. P. 19.
The English statutes of distribution were molded, largely upon the Roman law of succession. These statutes governing the distribution of personal property (29 Can. 11, and 1 Jac. 11) were taken for the basis of the laws of descent, as well as distribution, by the various States after the separation from the mother country. Whilst some of the principles of the canons of descent are found in our statutes, the pervading spirit is derived from the statutes of distribution. By the common law, an ancestral quality was only given to something that was fixed a,nd permanent and the identity of which could always be determined. The thing that descended always descended in specie. The stability of lands is fixed by *537 the laws of nature. Their owners may come and go with each generation, but their identity is preserved through all the ages. But personal property is unstable. It may change its forms many times in the hands of the same owner. It may be consumed and destroyed. Its identity is easily lost. At common law, it did not descend like real estate to the heir, but went to the personal representative of the deceased. This rule has been modified to a limited extent by force of our statutes. The heir has title and interest in the personal estate before the appointment of an executor or administrator, subject to be divested by such appointment. Coldron v. Rhode, Admr., 7 Ind. 151; Hutson, Admr., v. Merrifield, Admr., 51 Ind. 24 (30).
At common law, an heir is one upon whom the law casts estate in lands immediately upon the death of the ancestor. Under our statute an heir is one who succeeds to the estate, both real and personal, immediately upon the death of the ancestor. The administrator, under the statute, is a mere trustee for the creditors and heirs of the intestate. If the personal property is not needed to pay debts, the heirs may distribute it among themselves without formal administration. The title they take they derive in the same manner as the title they acquire to the real estate of the deceased. They take title in both instances by force of the statute, and it matters not whether it be called descent or succession. Brown, Exr., v. Critchell, 110 Ind. 31 (36); Humphries, Admr., v. Davis, 100 Ind. 369 (372); Bowen v. Stewart, Admr., 128 Ind. 507 (515).
Personal property, as well as real estate, does descend and has an inheritable quality. Our statute does follow the common law to the extent that it recognizes the superior claims of blood relationship in the descent of real estate. The blood of the ancestor that acquired the prop *538 erty is preferred in tlie descent from the intestate. There is a sense of justice and equity in this rule. The blood descendants of him who acquired it should have superiority over those who are not of his blood. Recognizing the difficulty in tracing title, and the many conflicting claims that might arise, the later rule of the common law did not attempt to go beyond the immediate ancestor of the intestate. Gardner v. Collins, 2 Pet. 58; Murphy v. Henry, 35 Ind. 442.
The source of the title while the property was in the intestate imparts to it certain characteristics. If it came to the intestate by gift, devise or descent from the immediate ancestor, we may denominate this quality ancestral, and that is what is meant by the use we make of this .term. Both real and personal property may have inheritable qualities and may descend to the heir and still have no ancestral quality.
In support of their position that the Legislature intended to give to personal property an ancestral quality counsel for appellant makes use of the following argument:
"Real estate was 'the favorite of the common law, which took but little account of personal property. It is a well known historical fact that personal property constituted but a small, a very small, part of the estates of the landed aristocracy and nobles of England when the common law ruled supreme. It is only in comparatively modern times that personal property has increased in amount and value to such extent that it now equals, if it does not surpass, real property.' Stocks and corporate bonds, which formed but a small fraction of the wealth of the country seventy-five or a hundred years ago, now amount to hundreds of millions and compose estates which, in value of principal and income, rival that of the estates of princes and nobles of a few hun *539 dred years ago. Of so little consequence was personal property that at the common law the husband had the right to dispose of all his personal property by will, and thus deprive his widow of any share thereof. Until recently the only restriction placed upon the husband’s right to dispose of his personal property by will was the right of his widow to $500 out of the first moneys received by the executor or administrator. But, recognizing the fact that many fortunes of great value consisted solely of personal property, the Legislature of 1891 gave the widow of a man dying testate the same interest in his personalty that she has in his real estate.”
There can be no doubt of the right and power of the Legislature to impart to personal property an ancestral quality. But the question here is not one of power. It is to determine what power the Legislature has exercised. Statutes are to be construed as forming a part of one system of jurisprudence. All statutes bearing upon the same subject-matter should be considered in attempting to ascertain the legislative intent. The court must presume that the Legislature, in enacting laws on any given subject intended to establish a uniform and harmonious system and in construing statutes, will endeavor to bring about such result.
The statutes regulating the settlement of the estates of deceased persons make the personal property the primary fund for the payment of debts-. It is required to be marshalled and exhausted that the realty may be saved to the heirs. It is easy to conceive how much confusion, and, perhaps, injustice, might result if such a construction be adopted as to give to personal property an ancestral quality. Counsel for appellee put the objection to such construction with much pith and force, as follows:
“Personal property is constantly changing, perishing, *540 being turned into property of a different kind, invested, reinvested, added to and taken from, so that in a few years, as a rule, its identity is lost. Suppose that personal property is received by ‘gift, devise or descent’ from two persons, that there are debts to pay and the property is sold to pay debts, and there is a surplus after the payment of debts, how is the surplus to be divided? No law requires an administrator to keep an account of how much came from one source or the other. How will the surplus be divided? If the property derived from one source is real estate and from the other it is personal property, and it takes all the personal property to pay the debts, greater in amount than the value of the real estate, does not the law require the administrator to exhaust the personal estate before he will be permitted to sell the real estate? And, would it not follow in such a case that the line from which the personal estate came would get nothing, and that that line would have to give up its ancestral estate in order to save to the other line the real estate? But if both real and personal stand upon the same footing, why should the one line take nothing and the other all?
“Again, suppose that one dies seized of real estate, which he acquired by purchase, no part of which came to him by ‘gift, devise or descent,’ of the value of ten thousand dollars. He dies the owner also of personal property of the value of ten thousand dollars, which came to him by ‘gift,’ or ‘devise’ or ‘descent.’ He died owing debts amounting to ten thousand dollars. Is it not the duty of the administrator to pay this indebtedness with the personal estate? * * The statute for the settlement of decedents’ estates makes it so. But if personal property so acquired is ancestral estate, it. would be doing a great injustice to the line from which it came to so apply it, if appellant’s position is correct.”
*541 There are other patent objections that are made against giving personal property an ancestral quality. In Jenks v. Trowbridge, 48 Mich. 94, it is said:
“We may next inquire whether the Legislature could have purposed that all movables should be liable to be impressed with the character of ancestral estate; because if that was the purpose as to any it was the purpose as to all. The provision will not permit any distinction. Without urging the point that if such had been the intention it would presumably have been declared in explicit terms and not been left in any uncertainty, the attention is directed to the nature, uses, and modes of handling such property and its vicissitudes of ownership as affording reason for thinking it was not meant to consider it as suitable to be classed in the category of ancestral 'estate. In all its forms it is subject to constant changes. At a given moment it may be in one thing and at the next in another. Transformations may ensue through buying, selling, exchanging, intermixing, or by accident, or through some other cause. It may exist in money or in something else resembling money. The particular form may be utterly destitute of stability or substantially incapable of specific identification. Yet the period for which the character of ancestral property may be re-lamed may exceed twenty years.
‘ ‘The general rule is that distributive rights are not affected by antecedent circumstances connected with the decedent’s source of acquisition, but depend on the state of things at his death.
“It is not to be supposed that property so mutable and so difficult to be identified and traced out, as some at least to which the principle must apply, if it apply to any, was intended to be brought within the rule governing ancestral estates.”
*542 In the case of Kelly’s Heirs v. McGuire, 15 Ark. 555. where this question arose, this language was used:
‘ ‘There are other reasons for the exclusion equally cogent. Personal property is movable from place to place, exists to-day and perishes tomorrow; while land remains the same, although the ownership may change •with the seasons. . In view of this difference and out of deference to the common law, it is reasonable to suppose that the statute never designed to embrace personal property throughout. If so, inquiry would have to be made as to ancestral and newly acquired property, which, in many instances, could hardly be satisfactorily done, and, in some, not at all: and the litigation that would spring up from such a prolific source, would be truly alarming. Families would be plunged into open hostility with each other; the ties of blood and kindred severed, and the peace and quietude of domestic life disturbed by an unworthy scramble for property. When the administrator proceeds to make distribution of the moneys in his hands, would it not be truly absurd to talk about ancestral and newly acquired estates? From the very nature of the thing, would it not be almost, or quite, impossible to ascertain the facts, or apply such a rule?”
A similar conclusion was reached in Cramer’s Appeal, 43 Wis. 167.
The difficulties here protrayed should have due consideration before reaching the conclusion that personal property has an ancestral quality. Appellant’s counsel make the argument that because it may be difficult to construe and apply the law is no sufficient reason to refuse to execute it; and that because in some cases it may be difficult to trace out the sources of title and enforce the statute, is not a sufficiént reason to deny the existence of the law. Whilst this is true, the difficulties which *543 would arise are so many reasons against such construction.
Our statutes governing the descent and distribution of property differs in some respects from those of Michigan, Arkansas and Wisconsin.
We have another statute relating to descent and distribution, the act of March 2, 1883; Burns Rev. 1894, section 837, concerning the adoption of children. It is in these words: “Such court, when satisfied that it will be for the interest of such child, shall make an order that such child be adopted, and from and after the adoption o,f such child it shall take the name in which it is adopted and be entitled to and receive all the rights and interest in the estate of such adopting father or mother, by descent or otherwise, that such child would if the natural heir of such adopting father or mother: Provided, however, That should such adopted child die intestate, without leaving wife or husband, issue or their descendants, surviving him or her, seized of any real estate or owning any personal property which may have come to such child by gift, devise or descent from such adopting father or mother, such property so coming to such adopted child shall, on its death, descend to the heirs of said adopting father or mother the same as if such child had never been adopted.”
This statute, although it is found among those relating to the adoption of heirs, is as much a statute of descent as if found under that classification. The estate of an adopted child who dies intestate and without issue must be settled by the law governing decedent’s estates. If the property came to the child by gift, devise or descent, from the adopting parent, the remainder after the payment of debts must go to the heirs of the adopting parent. It applies to personal estate as well as realty. It was clearly the intention of the legislature in this in *544 stance to impart to personal property an ancestral quality. Or, in other words, it is required to go back to the sources from whence it came.
Every objection that is made against construing the other statutes so as to give personalty an ancestral character can be made against this statute. The same difficulties arise in its application and enforcement. Personal property which came to the intestate by gift, devise or descent, may, under this statute, be taken to pay debts in order to save ancestral real estate for another line of heirs, or to save non-ancestral real estate. This statute is too clear to admit of doubt; too plain to admit of construction. It says that personal property shall go back to the sources from whence it came. If the Legislature intended in this instance to impress an ancestral quality upon personal property, there is strong reason for holding that it intended to do so in the instances where it is said that real and personal property shall descend in the same manner. However unjust it may seem to take ancestral personal property and exhaust it in paying debts to save the realty to another line of heirs, it is certainly in the power of the Legislature to require it to be done.
We have somewhat reluctantly reached the conclusion that it was the legislative intent in the distribution of personal property to have a regard for the line of blood from which it came. There may be cases where hardships and seeming injustice result, but many in-testates leave large personal estates with few debts.
The heirs may make division among themselves upon the lines adopted by the law, and if any part of the personalty is ancestral it may so descend, or be divided. Personal property, like real estate, in order to retain its ancestral character, must remain and descend in specie. It must be the same thing that came from the ancestor; the same parcel of real estate; the same article of per *545 sonal property. If real estate which, descends] to the heir be exchanged for other real estate or sold, and its proceeds invested in other real estate, the newly acquired realty loses its ancestral quality. Armington v. Armington, 28 Ind. 74; Murphy v. Henry, supra; Abshire v. State, ex rel., 53 Ind. 64; Henson, Admr., v. Ott, 7 Ind. 512. The same rule applies with equal if not greater force to personal property.
The personal property of Daniel Gilkey has undergone many transformations since it left his ownership. None of it remains in the same condition as when it left his possession and ownership except the seventy shares of bank stock, and the four shares of stock in the agricultural society. The appellant, however, contends that all the personal property ever since it left the hand of Daniel Gilkey has been in custody of the law, being first in the hands of the executor, then of the guardian, and lastly of the administrator; that Mary D. Gilkey never exercised any control over it, and. that her will never operated upon it to change its form; that whatever changes have been made were made by the officer of the court; that the property must be treated as a trust, and still impressed with the same qualities which it had when the title first came to her. It is true that property in the hands of an executor, administrator or guardian, is in a certain sense in custodia legis. Turner v. Flagg, Guar., 6 Ind. App. 563 (569).
Such property is not subject to levy and sale on execution. Freeman Executions, section 131. It is the duty of a guardian to manage the property in his hands to the best interest of his ward, and in proper cases to maintain and educate his ward. He should, if possible, make the income pay the expenses, but the law does not require that he shall keep two separate and distinct funds *546 or to separate the income from the principal. If it be' to the best interest of the ward, he may pay debts and expenses out of the principal when there is no income available for that purpose.
He can not discharge the duties enjoined upon him by statute unless he is permitted to exercise, in a measure, his own judgment and discretion.. Within the sphere of his duty, the powers of the guardian are no less than those of the absolute owner of the property. For the time being the law is substituted for the will of the beneficiary, and whatever the law requires to be done or whatever changes are necessarily made in the personal property, they stand upon the same footing as if they had been made by the owner. There is no finding here that the guardian was guilty of any breach of trust or failed to do his duty in any respect. The presumption must prevail that he managed the estate properly and as the law directs. The rents of the real estate and the income from the personalty became the absolute property of the ward, no matter what quality the law impressed upon the original property. The rents of the realty and the income from the personalty have been so commingled with the principal that it is impossible to distinguish one from the other. The costs and expenses of the guardianship were greater than the income. The money sought to be distributed is not the same property that went into the hands of the executor or guardian! It has lost its identity, and with it its ancestral quality.
There are cases where a court of equity will follow land or even money in whatever form it may assume for the purpose of upholding ah equity, but this doctrine does not apply to the devolution of property. Armington v. Armington, supra.
The court did not err in holding that one-half of it went to the paternal and one-half to the maternal line.
*547 Filed Feb. 8, 1895.
As to the bank stock and the shares in the agricultural society, we do not consider that their distribution is necessarily involved in this proceeding.
The opinion given is done at the request of counsel, and in order to facilitate the settlement of the estate. This property, still retaining the same form as when it left the ownership of Daniel Gilkey, it goes to the paternal line to the exclusion of the maternal line. It is expressly provided by statute in this State, Burns R. S. 1894, section 2484 (R. S. 1881, section 2279), that stock in corporations shall not be sold except on the order of the court, but shall be distributed to the persons entitled thereto.
Judgment affirmed.