OXFORD *v.* HOPSON.

Opinion delivered December 3, 1904.

DEED—DURESS.—The deed of a grantor who is shown to have been addicted to the use of morphine for many years, to such extent that her mind was greatly weakened, will not be set aside for that reason merely if the grantee took no advantage of her situation, and the trade does not seem to have been an improvident one.

Appeal from Little River Chancery Court.

JAMES D. SHAVER, Chancellor.

*Kirby & Carter,* for appellants.

The evidence shows that Mrs. Alexander was not in mental condition to make a binding deed at the time of its execution, and it should not be allowed to stand. 26 Ark. 604; 6 Ves. 266; 4

Barb. 379; 5 Black. 509; 12 How. 200; 1 St. Eq. § 249; 2 Pom. Eq. Jur. § 928; 1 St. Eq. § § 244-250.

*W. H. Arnold* and *L. A. Rowland,* for appellee.

The evidence totally fails to show lack of mental capacity or any such circumstances of fraud as would demand that it be set aside.

McCULLOCH, J.   The appellants, May and Myra Oxford, suing by their next friend, C. E. Oxford, who is their father, brought this suit in the chancery court of Little River County against Walter S. Hopson to cancel a deed executed on December 29, 1897, by their grandmother, Mrs. Rhoda Ann Alexander, to Hopson, conveying a tract of land described as fractional section 13, township 13 south, range 33 west.

Mrs. Alexander died intestate in May, 1900, at the age of 50 years, leaving the plaintiffs as her heirs at law.   They allege that Mrs. Alexander had for many years been addicted to the excessive use of morphine, and that her mental faculties had become so impaired that she was incapable of transacting business, and that the defendant Hopson had, by fraud and misrepresentation practiced upon her, procured the conveyance while she was in that condition.

The chancellor found in favor of the defendant, and rendered a decree dismissing the bill for want of equity, and the plaintiffs appealed.   Since the appeal was taken, the defendant died, and the cause was revived in the name of his administratrix.

The undisputed testimony shows that Mrs. Alexander owned two contiguous farms fronting on the river, the tract in controversy containing between 160 and 171.9 acres (the precise acreage being disputed,) and 115.6 acres in section 18, township 13 south, range 32 west, and that in 1896 she mortgaged both tracts to J. S. Anderson, a merchant, to secure an account of supplies furnished to the amount of $500.   In January, 1897, her son-in-law, C. E. Oxford, paid the mortgage debt to Anderson, and caused an assignment of the debt and mortgage to be made to himself by Anderson.   The deed from Mrs. Alexander recites a consideration of $554, applied in payment of the mortgage debt and interest, and $11.60 taxes paid, and the agreement of the grantee to build a lawful fence on the lands in section 18 still owned by the grantor.

The testimony establishes the fact that she had been a morphine habitue for nearly thirty years, increasing the quantity of the drug used year by year until she consumed habitually three-eighths of an ounce weekly. The testimony is conflicting as to the extent that her mental faculties were impaired, but it is established beyond doubt that she used the drug to great excess, and that her mind was affected thereby. She appears, moreover, to have been a woman of many eccentricities; whether resulting from use of the drug or natural traits, we are unable to decide.

We are convinced, after careful consideration of all the evidence, that her mind was greatly weakened to the extent that her ability to intelligently transact important business affairs may well be doubted; though she understood when such matters were explained to her, and at times was capable of acting with considerable degree of intelligence upon her own initiative; and we think it quite plain that at the time of the execution of this conveyance her mental condition was such that she was incapable of properly discerning and resisting fraud or imposition practiced by one in whom she reposed a large measure of confidence. Her condition was such as to call for an application of the doctrine so well stated by Mr. Justice HEMPSTEAD in the case of *Kelly's Heirs* v. *McGuire*, 15 Ark. 555: "While the solemn contracts between men should never be disturbed on slight grounds, yet it may perhaps be assumed as a safe general rule that whenever a person, through age, decrepitude, affliction or disease, becomes imbecile and incapable of managing his affairs, an unreasonable or improvident disposition of his property will be set aside in a court of chancery." And again he says: "Story lays down, as a doctrine well established by authority, and as generally true, that the acts and contracts of persons who are of weak understanding, or who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justifies the conclusion that the party has not exercised a deliberate judgment, but has been imposed upon, circumvented or overreached by cunning, or artifice, or undue influence."

So in this case, if we could find anything in the record to justify the conclusion that Hopson exerted any undue influence, or resorted to any misrepresentation or unfair means or artifice, in procuring the conveyance from Mrs. Alexander, or that he

took advantage of any confidential relations, and thereby induced her, whilst in that weakened mental condition, to execute the deed, we would not permit it to stand. But we find nothing to warrant that conclusion, and, on the contrary, find that, so far as the record discloses, he took no advantage of her situation. The price he paid for the land was inadequate, it is true, but, considering the conditions surrounding her, it cannot be said to have been an unwise or improvident trade for her to make. Both of these farms were under mortgage held by her son-in-law, C. E. Oxford, the only person to whom she might reasonably look for aid, and who was urging immediate payment, and threatening to foreclose. She had no other property or means, and had searched in vain for some one who would lend her the money to pay the debt. No special relationship of confidence subsisted between her and Hopson except that of neighbors, and in her extremity she applied to him for a loan, and at the same time proposed to convey one of the farms to him in consideration that he pay the mortgage debt. It does not appear that he pressed the negotiation with any undue haste, but he postponed it until the next day, and then accepted her offer, and proposed to have the two places surveyed and platted, and give her choice as to which she would retain. This was done, and meanwhile he paid the mortgage debt, and took a transfer of it to hold as security until the sale should be consummated. She made her choice to retain section 18, and conveyed section 13 to him. It is shown, too, that the value of both places had been greatly depreciated on account of overflows and from other causes, and that both had become so badly out of repair that they were not remunerative. By this sale to Hopson she not only relieved herself of debt, but procured the remaining farm to be improved and placed upon a remunerative basis. Considering her financial distress, this was by no means an improvident arrangement, notwithstanding the inadequacy of the price. It appears to have been the best terms she could obtain, and equally as good as the offer made by her son-in-law, Oxford, who proposed to pay her $200 annually for life for a conveyance of both tracts.

We think that the findings of the chancellor are supported by the testimony, and his decree is affirmed.